**[J-51-2023]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

FREDERICK E. OBERHOLZER, JR. AND
DENISE L. OBERHOLZER,

               Appellees

        v.

SIMON AND TOBY GALAPO,

               Appellants

: No. 104 MAP 2022
:
: Appeal from the Order of the
: Superior Court at No. 794 EDA 2020
: dated April 18, 2022, Vacating the
: judgment of the Montgomery County
: Court of Common Pleas, Civil
: Division, entered April 1, 2020, at
: No. 2016-11267 and Remanding.
: (The order of the Superior Court
: dated April 5, 2022, withdrew the
: March 7, 2022, memorandum.)
:
: ARGUED: October 17, 2023

**OPINION**

**JUSTICE DOUGHERTY**                               **DECIDED: August 20, 2024**

"Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and . . . inflict great pain." *Snyder v. Phelps*, 562 U.S. 443, 460-61 (2011). Presently, we must determine whether signs decrying hatred and racism, placed by a Jewish family on their own lawn after a neighbor called one of them a "fucking Jew," were properly enjoined by the trial court. Our review requires close inspection of the contours of the free speech provision found in Article I, Section 7 of the Pennsylvania Constitution, and our careful examination leads us to conclude the injunction order in this case violates our organic law.

# I. Factual Background

Dr. Simon and Toby Galapo (appellants) own a home in Abington Township, Montgomery County, the rear yard of which borders the property of Frederick and Denise Oberholzer (appellees). Although the properties are separated by a creek, low-lying shrubs, and some tall trees, the houses and yards remain visible to one another. In November 2014, a brewing feud between the neighbors over landscaping issues reached a boiling point after Dr. Galapo confronted Mr. Oberholzer about a resurveyed property line and Mrs. Oberholzer responded by calling him a "fucking Jew."[1] This prompted the Galapos in June 2015 to erect the first of many signs primarily displaying anti-hate and anti-racist messages "along the back tree-line directly abutting [the Oberholzers'] property line, pointed directly at [the Oberholzers'] house, and in direct sight of [other] neighbors' houses." Amended Complaint, 7/5/16, at ¶12. All told, the Galapos posted twenty-three signs over a years-long span, during which the neighbors continued to quarrel over other minor nuisances.[2]

On June 7, 2016, the Oberholzers filed a civil complaint, which they amended on July 5, 2016. The amended complaint pleaded five causes of action: (1) private nuisance;

---

[1] *See* N.T. Deposition of Denise Oberholzer, 3/13/18, at 6-7, 12-13 (admitting she made the statement, was aware the Galapos are Jewish, and intended her "unkind term" to upset Dr. Galapo); *see also* N.T. Deposition of Frederick Oberholzer, 3/13/18, at 17 ("my wife yelled a racial slur, or whatever you want to call it"). Apparently, similar incidents of this kind had occurred on other occasions as well. *See, e.g.*, N.T. Preliminary Injunction Hearing, 10/18/16, at 73 (Dr. Galapo alleging that, during a prior instance when his kids were swimming in his backyard, "Mrs. Oberholzer opened up the second-story window [of her home and] screamed out, you fucking Jewish kids, can't you shut up"); *see id*. at 46 (stating the Oberholzers had "discuss[ed] me and my wife as being arrogant Jews who are cheap"); *see also* N.T. Deposition of Frederick Oberholzer, 3/13/18, at 18 (admitting he may have called Dr. Galapo an "arrogant son of a bitch"); *id*. at 23 (asserting Dr. Galapo "called me a racist from his deck . . . on our holiday, on Easter Sunday").

[2] The signs bore the following messages:

(continued…)

(2) intrusion upon seclusion; (3) defamation – libel and slander; (4) publicly placing the Oberholzers in false light; and (5) intentional infliction of emotional distress. *See*

---

(1) No Place 4 Racism

(2) Hitler Eichmann Racists

(3) Racists: the true enemies of FREEDOM

(4) No Trespassing – Violators Will Be Prosecuted

(5) Warning! Audio & Video Surveillance On Duty At All Times

(6) Racism = Ignorant

(7) ✡ Never Again

(8) WWII: 1,500,000 children butchered: Racism

(9) Look Down on Racism

(10) Racist Acts will be met with Signs of Defiance

(11) Racism Against Kids Is Not Strength, It's Predatory

(12) Woe to the Racists.  Woe to the Neighbors

(13) Got Racism?

(14) Every Racist Action Must be Met With a Sign of Defiance

(15) Racism is Self-Hating; "Love thy Neighbor as Thyself"

(16) Racism – Ignore It and It Won't Go Away

(17) Racism – The Maximum of Hatred for the Minimum of Reason

(18) RACISM: It's Like a Virus, It Destroys Societies

(19) Racists Don't Discriminate Whom They Hate

(20) Hate Has No Home Here [in multiple languages]

(21) Every Racist Action Must Have an Opposite and Stronger Reaction

(22) Quarantine Racism and Society Has a Chance

(23) Racism Knows No Boundaries.

Confidential Settlement Agreement, 6/5/19, at ¶5.

Amended Complaint, 7/5/16, at ¶¶65-109. The central theme underlying all claims was that the "signs were placed solely to harass, slander and defame [the Oberholzers], who are German by descent, by the Galapos, who putatively are Jewish by descent." *Id*. at ¶14. According to the Oberholzers, the "signs are so content-incendiary as to incite hatred, ridicule and disgust[.]" *Id*.; *see id*. at ¶13 (signs "consist of hate speech, slander and defamatory, unfounded innuendo and slurs directed openly and notoriously towards [the Oberholzers] and their property").[3]

Notably, as to the first four causes of action, the Oberholzers claimed "money damages would be inadequate to remedy [their] injuries and damages, and would be inadequate to prevent similar future harm and conduct by [the] Galapos." *Id*. at ¶¶73, 81, 91, and 102. In this regard, the Oberholzers asserted they "will be forced in the future to suffer irreparable harm in not being able to use their property free from the continued threats, action, behavior and conduct of [the] Galapos[,]" and that "such threats, action, behavior and conduct [by them] could never outweigh the interests [the Oberholzers] have in the use, privilege, occupation and enjoyment of their property free from [the] Galapos' conduct." *Id*. So, with respect to those claims, the Oberholzers sought equitable relief in the form of an order enjoining the Galapos from "posting and publishing hate-signs

---

[3] We note the Oberholzers identified several other factual bases, in addition to the signs, to support their various causes of action. *See, e.g.*, Amended Complaint, 7/5/16, at ¶16 (asserting the Galapos unnecessarily contacted police about the Oberholzers' dogs supposedly barking); *id*. at ¶22 (alleging the Galapos "installed new high density, powerful floodlights on the rear deck of their house, and purposely directed the lighting towards [the Oberholzers'] property and the back of their house"). However, these other claimed nuisances have either abated or been abandoned by the Oberholzers. *See id*. at ¶31 (acknowledging the Galapos' "[u]se of the deck lights abated after [the Oberholzers] filed complaints, and by mid-January 2016, . . . [the] Galapos turned the deck lights away from [the Oberholzers'] home"); *see also* N.T. Preliminary Injunction Hearing, 10/18/16, at 24 (counsel for the Oberholzers conceding any claims concerning their dogs "isn't part of the injunction"). In fact, their counsel "clarif[ied]" at the preliminary injunction hearing that "the only activity sought to be enjoined was the signage[.]" Trial Court Op., 4/28/17, at 4. As such, our focus in this appeal is exclusively on the signs.

containing false, incendiary words, content, innuendo and slander," as well as "signs containing open and notorious incendiary racial and ethnic slander, or any signs about [the Oberholzers] at all[.]" *Id*.

Separately, on July 13, 2016, the Oberholzers filed a "Petition for Preliminary and/or Special Injunctive Relief Pursuant to Pa.R.Civ.P. 1531." Therein, they sought an order "requiring [the] Galapos to immediately remove all signs" and "placards . . . placed on [the] Galapos' property facing or directed against the Oberholzers and their property and home[.]" Petition for Injunctive Relief, 7/13/16, at 1. The Oberholzers averred an injunction was warranted to protect their "constitutional rights . . . to live, and exercise their liberty and property interests, free from such libel and defamation[.]" *Id*. at 13. In response, the Galapos claimed the Oberholzers' "request for injunctive relief must be denied because such an injunction would constitute [a] prior restraint, which is prohibited by . . . Article I, Section 7, of the Pennsylvania Constitution." Memorandum in Support of Response to Petition for Injunctive Relief, 7/25/16, at 8 (unpaginated).

On August 26, 2016, the parties entered a temporary consent order in which the Galapos agreed to remove their signs (except for the "No Trespassing" sign and the sign warning of surveillance on their property) pending the outcome of a hearing for preliminary injunctive relief.

At that hearing, the Oberholzers' counsel clarified that, despite seeking injunctive relief as to multiple claims in the amended complaint, in fact, the preliminary "injunction is only on count four of this complaint" — *i.e.*, the false light claim. N.T. Preliminary Injunction Hearing, 10/18/16, at 8; *see id*. at 195 (stating the petition "focuses only on count four of this complaint, not one, not two, and not three [or five]"). As counsel explained it, injunctive relief on that sole claim would be appropriate since a "false light claim does not involve defamation." *Id*. at 10; *see id*. ("I don't care if it's a placard, a sign,

a note, a letter, a musical note, whatever it could be, it's not a speech issue. The Restatement doesn't talk about [a false light claim] as speech."). The Galapos' counsel, meanwhile, argued injunctive relief would be an inappropriate remedy for any of the causes of action alleged in the complaint. *See id*. at 14-15 ("Even if it were something that is defamatory or false light, my clients still have their [constitutional] rights to post those signs. They may be civilly liable for it in terms of damages later on, but that's their right, as long as they're willing to accept those consequences.").

The parties then testified. Dr. Galapo first explained his intent behind his posting of the signs: he "want[s] people to understand what happens with racism." *Id*. at 54. For example, he posted the sign stating "Hitler Eichmann Racists" because Adolf Hitler and Adolf Eichmann represent "the consequence of where racism goes and where anti-Semitism goes and how it affects people and how it kills people." *Id*. at 34. Similarly, Dr. Galapo elaborated that he posted the "Woe to the Racists[,] Woe to the Neighbors" sign because it implies "there's a deficiency in the one who is racist and it . . . affects the neighbors as well. And this can be taken both on a community level, on an individual level, as well as on a worldwide level." *Id*. at 43-44.

At the same time, Dr. Galapo described how he also wants to specifically "protest" the Oberholzers' behavior. *See, e.g., id*. at 41 ("what I want to accomplish by the signs is to protest behavior which we perceive as being racist towards myself, my wife, and my family"); *id*. at 57 ("That is my intent of the sign [regarding 1.5 million butchered children during World War II], to protest racist behavior, because that's where it ends up."); *id*. at 58 ("I want the Oberholzers to see the signs and see where their actions have taken it."); *id*. ("The intent of the signs w[as] for the Oberholzers to change a behavior which we perceived as being racist[.]"); *id*. at 61 ("And I want to teach my children that when racism rears its head, you have to fight it tooth and nail."). To that end, Dr. Galapo explained his

view that "signs in general . . . are there to change behavior, to make you aware of what's going on, of what people are doing[.]" *Id*. at 85. He noted how their previous attempts to resolve their disputes with the Oberholzers through a community affairs group and the local police had been unsuccessful after those entities told them "they can't change people's behaviors." *Id.* at 59. From Dr. Galapo's perspective, then, the signs were the only way they "could respond to anything that was going on." *Id*. at 50; *see id*. at 54 (stating he faced the signs towards the Oberholzers because "that's . . . where the greatest threat is").

For his part, Mr. Oberholzer testified he could see "[n]othing but signs" when he looked out the back windows and door of his home's Florida room. *Id*. at 150. Regarding the content of the signs, he explained: "Some of them are truth[ful.] Some of them, I don't know what they mean." *Id*. at 175. He further noted the signs could be seen from the sidewalk and that passersby would stop to read them. *See id*. at 113-14, 121. According to Mr. Oberholzer, although no one has told him they believe he's a racist, some "people have stopped talking to" him, presumably because of the signs. *Id*. at 176.

Following the parties' testimony, counsel rehashed their central arguments for the trial court. The Oberholzers' counsel maintained an injunction was warranted because "the false light case is not speech." *Id*. at 201. Conversely, the Galapos' counsel argued: "Whether it is defamation or . . . false light, the issue . . . is whether my clients can post signs with written words on them on their own property." *Id*. at 209-10. In counsel's view, written words are "the same as verbal speech." *Id*. at 210; *see id*. ("Speech is speech is speech[.]"). Counsel also advocated that, even though the Galapos could be held civilly liable for damages, they still "have the right to make [such] speech" in the first instance "per Article I, Section 7 of the Pennsylvania [ ] Constitution." *Id*. at 213.

Subsequently, the parties submitted to the trial court supplemental filings on the preliminary injunction issue. In their filing, the Oberholzers seized upon Dr. Galapo's repeated use of the word "protest" during his testimony to argue that the Galapos' "actions and conduct in posting these denigrating, scornful hate signs amounts to *prima facie*, good old-fashioned picketing." Supplemental Petition for Preliminary Injunction, 11/3/16, at 4. To the Oberholzers, "[i]nvasive, notorious picketing of a private residence enjoys no legal safe-harbor or [constitutional] protection[.]" *Id*. Rather, "[u]nwelcome, unwanted speech that a private homeowner cannot escape, that intrudes privacy and destroys a quiet, decent lifestyle . . . can be (and must be) outright banned." *Id*. at 4-5; *see id*. at 12-13 ("Picketing — open, notorious protesting — that is harassing and invasive of the privacy of another can be enjoined[.]").[4]

In reply, the Galapos said the Oberholzers wrongly portrayed their signposting as an expressive activity akin to picketing. They countered that "the signs at issue constitute 'pure speech[.]'" Supplemental Response to Petition for Preliminary Injunction, 11/10/16, at 6 (unpaginated); *see id*. ("Placing signs on one's own property, and nothing more, does not involve any acts which could be considered 'expressive conduct.'"). To buttress their position the signs constitute pure speech, the Galapos observed that the Oberholzers variously referred to them "as 'hate signs,' 'scornful,' 'reprehensible,' and 'highly offensive to a reasonable person,' among other things." *Id*. at 6-7. Such language, they argued,

---

[4] Within this filing, the Oberholzers attempted to walk back the concession their counsel made at the preliminary injunction hearing, *i.e.*, that the Oberholzers were only seeking an injunction as to count four of the amended complaint. *See* Supplemental Petition for Preliminary Injunction, 11/3/16, at 2 (noting counsel at the hearing "did not articulate an argument summarizing [the Oberholzers'] right to enjoin" the signs "as an intrusion upon seclusion (Count II)" but stating, "this supplemental brief will"). However, the trial court appears to have deemed the issue abandoned, as it did not address it in its later opinion. *See* Trial Court Op., 4/28/17, at 2 (stating the Oberholzers' counsel at the preliminary injunction hearing "narrowed the request for a preliminary injunction, as arising only under the fourth count").

clearly demonstrates the Oberholzers simply "do not like **the content** of those signs" as opposed to some physical aspect about them, like their dimensions or quantity. *Id*. at 6 (emphasis added); *see id*. at 7 ("Surely, such an injunction would not be intended to apply to a 'for sale' sign, a 'caution' sign relating to the use of [the Galapos'] pool, holiday decoration[s], or a political sign supporting one of the presidential candidates."). Moreover, the Galapos reiterated their belief that, if they "cannot post signs on their own property, . . . they have no alternative location to 'protest' [the Oberholzers'] actions." *Id*. at 8. Finally, the Galapos stressed the fact that no Pennsylvania court has ever suppressed speech "to prevent another from being placed in a false light[,]" and they argued that doing so "would constitute [an] impermissible prior restraint under Article I, Section 7 of the Pennsylvania Constitution[.]" *Id*. at 11.

The trial court denied the petition for preliminary injunctive relief on November 21, 2016. The Oberholzers then took a short-lived appeal of that decision. In a Pa.R.A.P. 1925(a) opinion prepared for that appeal, the court explained the Oberholzers "failed to show, at least sufficiently to warrant the extraordinary relief of issuing a preliminary injunction, that [the Galapos'] sign-posting was actionable as an invasion of privacy portraying [the Oberholzers] in a false light, that their right to relief was clear, and that the wrong was manifest, or, in other words, that [the Oberholzers] were likely to prevail on the merits of their false-light cause of action." Trial Court Op., 4/28/17, at 8. Significantly, the court opined that it had constitutional concerns about "enjoining what was, on some levels, pure speech[.]" *Id*. The court further remarked that it was "uncertain" whether the Oberholzers could prevail on the merits of their false light claim considering the testimony given. *Id*.

Around the same time the Oberholzers took that appeal, the trial court overruled the Galapos' preliminary objections. The Galapos thereafter filed an answer to the

amended complaint and proceeded with discovery. Notably, during their depositions, the Oberholzers conceded none of the signs mentioned them by name, were threatening, or encroached their own property. *See* N.T. Deposition of Denise Oberholzer, 3/13/18, at 42-43; N.T. Deposition of Frederick Oberholzer, 3/13/18, at 29-30.

Following discovery, and after the Oberholzers discontinued their appeal of the order denying preliminary injunctive relief, the parties proceeded to file cross-motions for summary judgment.[5] On September 6, 2018, the trial court granted in part and denied in part the Galapos' motion. Specifically, it dismissed with prejudice the intrusion upon seclusion cause of action contained in the second count of the amended complaint but denied the balance of the Galapos' motion for summary judgment; it also denied in full the Oberholzers' cross-motion.

On June 4, 2019, the parties appeared before the trial court for a settlement conference hearing. They explained they'd "reached an agreement that in connection with . . . all affirmative claims in the complaint for all damages, [the Galapos] would pay" the Oberholzers a certain monetary amount. N.T. Settlement Conference Hearing, 6/4/19, at 2. The next day, the court accepted the settlement agreement, the relevant portion of which provides:

> [I]n return for the payments described in Paragraph 1 above further subject
> to the provisions of paragraph 6, and for the mutual promises contained
> herein, the Oberholzers . . . do hereby release, acquit, exonerate, and

---

[5] Within their cross-motion for summary judgment, the Oberholzers requested permanent injunctive relief. In contrast to their request for preliminary injunctive relief, in which they ultimately narrowed their request to the false light claim, *see supra* note 4, for purposes of permanent injunctive relief, they returned to their original, broader position — that is, they sought injunctive relief with respect to four causes of action. *See* Memorandum in Support of Cross-Motion for Summary Judgment, 8/27/18, at 21 ("permanent injunctive relief . . . must be granted . . . on the invasion of privacy and nuisance claims"); *id*. at 25 (since signs "libel and defame the Oberholzers, . . . [p]ermanent injunctive relief . . . is warranted"); *id*. at 30 ("permanent injunctive relief[ ] is warranted for the Oberholzers on the claim of false light").

forever discharge the Galapos . . . from all and every manner of action . . . **arising from the posting of signs on the Galapos' property containing the statements and/or communications enumerated specifically in paragraph 5 in the past, present or future**.

Confidential Settlement Agreement, 6/5/19, at ¶4 (emphasis added).

The settlement agreement did "not prohibit, limit or affect [the Oberholzers'] rights to seek and/or pursue their claim in equity for injunctive relief . . . prohibiting the present and/or future posting of signs on [the Galapos'] property enumerated specifically in paragraph 5[.]" *Id*. at ¶6. Moreover, although the Galapos in the agreement did "not admit any wrongdoing or liability," they agreed not to argue, in opposing the Oberholzers' request for permanent injunctive relief, that the Oberholzers "failed to succeed on the merits of their claim for such relief." *Id*.

The parties stipulated that, in ruling on the request for a permanent injunction, the trial court would consider certain deposition transcripts, the preliminary injunction hearing transcript, and select exhibits. The court also heard oral argument. Thereafter, on September 12, 2019, the court entered an order granting in part the Oberholzers' request for a permanent injunction. More precisely, the court permitted the signs already posted on the Galapos' property to remain but directed that they "be positioned in such a way that they do not directly face and target [the Oberholzers'] property: the fronts of the signs (lettering, etc.) are not to be visible to [the Oberholzers] nor face in the direction of [their] home." Order, 9/12/19, at 1.

In an accompanying opinion, the court explained an injunction is appropriate where the party seeking it establishes a "right to relief is clear, [it] is necessary to avoid an injury that cannot be compensated by damages, and [ ] greater injury will result from refusing rather than granting the relief requested." Trial Court Op., 9/12/19, at 5, *citing Kuznik v. Westmoreland Cty. Bd. of Comm'rs*, 902 A.2d 476, 489 (Pa. 2006). The court found the Oberholzers met all criteria. *See id*. at 7 (concluding, "[d]espite the monetary settlement

reached between the parties," that the Galapos' "actions severely and negatively impact [the Oberholzers'] well-being, tranquility, and quiet enjoyment of their home"); *id.* at 8 (finding the Oberholzers "have no adequate remedy at law" and "a greater injury of a continuing intrusion on [their] residential privacy will result from refusing to grant the equitable relief sought and allowing the existing signs to remain as they are").

The trial court next addressed the Galapos' free speech arguments. It identified the issue before it as "whether the First Amendment of the U.S. Constitution and Article I, Section 7 of the Pennsylvania Constitution permit[ ] this court to enjoin [the Galapos] from posting signs on their property denouncing hatred, racism and anti-Semitism in their effort to change the perceived offensive behavior of [the Oberholzers]." *Id*. at 5. The court then summarized the parties' core positions as follows:

> [The Oberholzers] argue that the [Galapos'] posting of signs on their property, in the manner in which they have, amounts to picketing[.] . . . They further argue that the picketing is designed to inflict psychological harm on their family, rather than convey a message of a particular belief or fact, and therefore is expressive conduct which, under the circumstances, is not constitutionally protected.
>
> The [ ] Galapos argue that the posting of signs that disseminate views on racism and Hitler are to be considered pure speech and therefore entitled to the utmost constitutional protection. They also argue that this cannot be considered picketing[.]

*Id*. at 8.

In the end, the trial court agreed with the Oberholzers that the Galapos' actions "cannot be considered pure speech[.]" *Id*. at 10. Instead, it viewed the Galapos' actions "as a personal protest" because "[t]he personal and specific messages of the signs are for the alleged racist behavior exhibited by [the Oberholzers], not racism generally existing in society." *Id*. at 9; *see id*. ("The placement of the signs indicates [the Galapos are] targeting specific individuals [to] decry their perceived racist behavior."); *id*. at 10 (determining the present circumstances "are analogous to the targeted picketing seen in"

*Frisby v. Schultz*, 487 U.S. 474 (1988)).  Based on that characterization, the trial court determined "the strongest constitutional protection is no longer warranted."  *Id*. at 10, *citing Rouse Phila. Inc. v. Ad Hoc '78*, 417 A.2d 1248, 1254 (Pa. Super. 1979) ("as a person's activities move away from pure speech and into the area of expressive conduct they require less constitutional protection").  The court further found the Galapos' "severe interference with [the Oberholzers'] residential privacy justifies this [c]ourt taking action in the way of a time, place, and manner restriction."  *Id*. at 11; *see S.B. v. S.S.*, 243 A.3d 90, 105 (Pa. 2020), *cert. denied*, 142 S.Ct. 313 (2021) (under First Amendment, time, place, and manner restrictions are valid "form of a content-neutral regulation of speech" if they "(1) are justified without reference to the content of the regulated speech; (2) are narrowly tailored to serve a significant governmental interest unrelated to speech; and (3) leave open ample alternative channels for communication of the information") (footnote and citation omitted).

Addressing the last prong first, the court explained its "order still allows clear and numerous alternative channels of communication."  Trial Court Op., 9/12/19, at 11; *see id*. (positing that the Galapos remain "free to continue to post signs on [their] property with any message [they] deem[ ] appropriate so long as they do not target or face [the] Oberholzers' property").  Turning back to the first prong, content neutrality, it stated: "With regard to the restriction being content neutral, the [c]ourt is being clear that all signs, no matter the language or images depicted, may remain but may not face or target the [ ] Oberholzers' property."  *Id*. at 12.  Lastly, the court declared the injunction was "narrowly tailored to serve the substantial government interest of protecting the [ ] Oberholzers' right of residential privacy."  *Id*.; *see id*. at 10 ("the [c]ourt's duty to protect residential privacy is paramount").

One other aspect of the court's opinion is noteworthy. In a final section, titled "The Galapos' Arguable Defamatory Publications Will Not be Enjoined[,]" the court recognized citizens in this Commonwealth "are provided greater protection of their exercise of free speech under the Pennsylvania Constitution[.]" *Id*. at 12, *citing William Goldman Theatres, Inc. v. Dana*, 173 A.2d 59, 62 (Pa. 1961) (Article I, Section 7 of the Pennsylvania Constitution "was designed to . . . prohibit the imposition of prior restraints upon the communication of thoughts and opinions, leaving the utterer liable only for an abuse of the privilege"). It specifically observed this Court has been critical of attempts by lower courts to carve out exceptions to the traditional rule that "equity lacks the power to enjoin the publication of defamatory matter." *Willing v. Mazzocone*, 393 A.2d 1155, 1158 (Pa. 1978) (plurality). Although the trial court found "the facts of this case are [not] strong enough to warrant a deviation from the traditional rule," it also did not think it had run afoul of the rule given that it "refused to issue a blanket injunction prohibiting all freedom of expression[.]" Trial Court Op., 9/12/19, at 12. In other words, the court believed its order instructing the Galapos to redirect their signs away from the Oberholzers' home, rather than remove them altogether, was a proper exercise of the court's equitable power that did not offend Article I, Section 7's prior restraint provision.[6]

Only days after the trial court granted permanent injunctive relief, the Oberholzers filed a petition to hold the Galapos in civil contempt, asserting that, while the Galapos had redirected the signs as ordered, the text remained visible from the Oberholzers' property.

---

[6] Although not explicit, the trial court's emphasis in its opinion on the "severe interference with [the Oberholzers'] residential privacy[,]" Trial Court Op., 9/12/19, at 11, suggests it granted permanent injunctive relief with respect to the nuisance cause of action. Notably, the court did not discuss false light at all; it dismissed with prejudice the intrusion upon seclusion claim; and, as just discussed, it took pains in its opinion to explain it was not granting injunctive relief as to the defamation cause of action. Moving forward, then, we operate under the understanding that injunctive relief was granted only on the nuisance cause of action.

After a hearing, the court declined to hold the Galapos in contempt but agreed to add the following language to its injunction order: "In order to ensure that none of the signs are visible regardless of their positioning, these signs shall be constructed with opaque material." Amended Order, 10/11/19, at 1.

The Galapos filed a motion for post-trial relief which the trial court denied following a hearing. After the Galapos filed an appeal, the court commented in its opinion that the case is one "of first impression because it concerns the Galapos' constitutional right to exercise freedom of speech in a residential context." Trial Court Op., 1/3/20, at 3. Still, the court defended its position "that when a citizen's exercise of [his or her] right to freedom of speech substantially impacts another citizen's private civil rights, that speech constitutes expressive activity and . . . may be subject to reasonable time, place and manner restrictions." Id. The court also maintained that, despite the monetary payment made to the Oberholzers under the settlement agreement, they "had no adequate remedy at law" given that the signs "interfered with [their] right to peaceful, tranquil enjoyment of their home." Id. at 4; see id. ("[T]o hold otherwise would give the Galapos the right to pay to continue to infringe on [the Oberholzers'] quiet enjoyment of their home."). The court thus viewed its order granting the permanent injunction as a proper "time, place, and manner restriction on the Galapos' right to freedom of expression that did not regulate the content of the signs[.]" Id.

In a published opinion, a split three-judge panel of the Superior Court vacated the trial court's amended order granting the permanent injunction in part and remanded for further proceedings. See Oberholzer v. Galapo, 274 A.3d 738, 768 (Pa. Super. 2022). Initially, the majority rejected the Galapos' argument that equitable relief was unavailable because there was another adequate remedy at law (i.e., money), concluding "the parties

unequivocally agreed [in the settlement] that [the Oberholzers] could pursue injunctive relief notwithstanding any monetary payments[.]" *Id*. at 748.[7]

Next, the majority considered whether the injunction imposed a prior restraint on the Galapos' speech in violation of the Pennsylvania Constitution. *See* PA. CONST. art. I, §7 ("The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty."); *see Pap's A.M. v. City of Erie*, 812 A.2d 591, 605 (Pa. 2002) (Article I, Section 7 "provides protection for freedom of expression that is broader than the federal constitutional guarantee") (citation omitted). The majority noted this Court has identified as prior restraints those orders which "prevent[ ] publication of information or material[,]" whereas orders that do "not prevent [the] publishing [of] any information" or otherwise prevent an individual "from writing whatever they pleased" are not unlawful prior restraints. *Oberholzer*, 274 A.3d at 749, *quoting Phila. Newspapers, Inc. v. Jerome*, 387 A.2d 425, 432-33 (Pa. 1978).

The majority gleaned additional insight into what qualifies as a prior restraint from our decision in *Willing*. There, Helen Willing, believing two lawyers had skimmed from a workers' compensation settlement they secured on her behalf, demonstrated in the pedestrian plaza between two buildings in downtown Philadelphia for several hours a day wearing a "'sandwich-board' sign around her neck" with the following handwritten message: "LAW FIRM of QUINN MAZZOCONE Stole money from me and Sold-me-out-to-the INSURANCE COMPANY." *Willing*, 393 A.2d at 1156. The lawyers moved for injunctive relief against Willing, and the trial court granted it. The Superior Court affirmed but slightly modified the injunction to prohibit Willing from "further demonstrating against and/or picketing" her former lawyers by "uttering or publishing statements to the effect"

---

[7] Appellants have since abandoned this argument, so we do not address it further.

that the lawyers stole money from her and sold her out to the insurance company. *Id.* at 1157 (internal quotations and citation omitted). On further review this Court reversed, concluding the lower courts' orders were "clearly prohibited" under Article I, Section 7's prior restraint provision. *Id.*

Based on this authority, the majority in this case did not "dispute that a permanent injunction can result in a prior restraint on speech." *Oberholzer*, 274 A.3d at 750. But it believed an order qualifies as a prior restraint only when it "forbid[s] **future** communications." *Id.* (emphasis in original), *citing, e.g.*, *Golden Triangle News, Inc. v. Corbett*, 689 A.2d 974, 979 (Pa. Cmwlth. 1997) ("a prior restraint is a prohibition on speech in **advance** of its publication or expression") (emphasis supplied by majority below). Here, the majority reasoned, the permanent injunction "does not involve a prior restraint on speech"; "[r]ather, it addresses the existing signs, *i.e.*, preexisting, and not **future**, communications[.]" *Id.* (emphasis in original). Thus, because in its view "the permanent injunction does not affect future communications," the majority concluded the Galapos were "due no relief on this issue." *Id.* at 751.

The majority next moved to the Galapos' free speech claims and began by setting forth several guiding legal principles. The general rule, it noted, is that government cannot censor offensive speech in the open marketplace of ideas and the burden is on the viewer to avoid offensive speech. *See id.*, *citing Snyder*, 562 U.S. at 459. However, the majority observed, "each medium of expression presents special First Amendment problems." *Id.* at 752, *quoting F.C.C. v. Pacifica Found.*, 438 U.S. 726, 748 (1978). It likewise recognized "the subject matter of the speech may modify the analytical framework[,]" *id.*, as may "the nature of the forum at issue[.]" *Id.* at 753 (citations omitted). So too may the "alleged state action at issue" — "[f]or example, the analysis for a municipal ordinance is different than the analysis for a court injunction." *Id.* at 754, *citing, e.g.*, *Madsen v.*

*Women's Health Ctr., Inc.*, 512 U.S. 753, 764 (1994). With these background principles in mind, the majority proceeded to its analysis.

The majority first confirmed as a threshold matter that "state action is involved," explaining the trial court issued, at the Oberholzers' request, "injunctive relief that specifically ordered [the Galapos] to position the signs away from [the Oberholzers'] property with the front of the signs not visible to [them]." *Id*. at 757; *see id*. at 754 ("state action includes a court order that infringes upon speech and is issued at the request of a private party in a civil lawsuit"), *citing Madsen*, 512 U.S. at 764. Having resolved that preliminary issue, the majority proceeded to consider whether the order granting the injunction is content-based or content-neutral. It discussed at length several decisions in which this Court and the United States Supreme Court determined whether a particular restriction on speech was content-based or content-neutral, something that "is not always a simple endeavor." *S.B.*, 243 A.3d at 105; *see Oberholzer*, 274 A.3d at 754-57 (examining, *inter alia*, *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015), *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357 (1997), and *Ward v. Rock Against Racism*, 491 U.S. 781 (1989)). That review led the majority to conclude as follows.

First, it held "the trial court's order is facially content-neutral, as it is unrelated to the content of the speech." *Id*. at 758 (citation omitted); *see id*. at 757-58 (finding "the instant injunction was . . . without reference to the content or subject matter of the signs" and "serves a purpose unrelated to" that content since it "ensure[s the Oberholzers'] constitutional right of residential privacy") (internal quotations and citation omitted). Next, relying on two Superior Court decisions in which that court held "a complete bar on protesting without reference to the content of the defendant's speech was . . . a content-neutral restriction," the majority reasoned "a similar restriction preventing [the Galapos'] signs from being seen because [they] violated [the Oberholzers'] right to residential

privacy, is also content-neutral." *Id*. at 758, *citing SmithKline Beecham Corp. v. Stop Huntingdon Animal Cruelty USA*, 959 A.2d 352, 356-59 (Pa. Super. 2008) and *Klebanoff v. McMonagle*, 552 A.2d 677, 678-79, 682 (Pa. Super. 1988). Finally, the majority said "the United States Supreme Court has rejected [the Galapos'] argument that because the injunction restricts speech [the Oberholzers] find offensive, the injunction must be content-based." *Id*., *citing, e.g.*, *Madsen*, 512 U.S. at 762 (refusing antiabortion protestors' argument that because injunction restricted their speech, it was "necessarily content or viewpoint based"; to accept that argument "would be to classify virtually every injunction as content or viewpoint based") and *Schenck*, 519 U.S. at 384 (injunction's "cease and desist" provision was content neutral despite banning only the speech of antiabortion protestors). Accordingly, the majority concluded the Galapos' "argument that the injunction is content-based is due no relief." *Id*.

The majority then considered the Galapos' final argument: that "even if the injunction is content-neutral, it still fails . . . to further a significant governmental interest" and, moreover, it "is not narrowly tailored." *Id*. at 758-59 (citations omitted). On this latter point, the Galapos "point[ed] out that the right to free speech protects both the speaker's ability to convey their message and the speaker's ability to ensure the message reaches the intended recipients." *Id*. at 759 (citation omitted). They therefore contended that "if they cannot post signs protesting [the Oberholzers'] anti-Semitic behavior in a manner that can be seen by the intended recipients, *i.e.*, [the Oberholzers], [then they] have no alternative means of communicating their message." *Id*. (citation omitted). The Oberholzers countered that the signs are an unwanted invasion of their privacy in the occupancy of their home that have forced them to stop using their backyard or going outside. *See id*. Given this, they argued the court-ordered injunction is a proper time, place, and manner restriction that is narrowly tailored — particularly since the Galapos

are free to continue to post the signs on their property so long as they do not target or face the Oberholzers' home.

Once more, before conducting its analysis, the majority examined in depth the relevant law in this arena. *See id*. at 759-66 (discussing, *inter alia*, *Madsen*, *Frisby*, *Klebanoff*, and *SmithKline*). It then rejected the Galapos' argument that the injunction does not further a significant government interest. It explained that in *Frisby*, the High Court "remarked that all members of the community have a right to residential privacy, which includes the right to 'enjoy within their own walls . . . an ability to avoid . . . unwanted speech[.]'" *Id*. at 766, *quoting Frisby*, 487 U.S. at 484-85. And it noted the Superior Court "has similarly recognized this right and that courts may enjoin any activity violating an individual's right to residential privacy." *Id*., *citing Klebanoff*, 552 A.2d at 678 and *SmithKline*, 959 A.2d at 357-58. Based on this, the majority held a "right to residential privacy may be violated when a listener is subjected to targeted speech, including picketing and protesting." *Id*.

Nevertheless, the majority concluded the trial court wrongly applied the time, place, and manner test when it "should have applied the heightened, more rigorous standard under *Madsen* in tailoring its injunction." *Id*., *citing Madsen*, 512 U.S. at 765 ("when evaluating a content-neutral injunction [(as opposed to an ordinance)], we think that our standard time, place, and manner analysis is not sufficiently rigorous"; courts "must ask instead whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest"). Because the trial court "applied an incorrect legal standard," the majority held the proper course was to "vacate the trial court's judgment and amended injunction and remand for further proceedings." *Id*. at 766-68.

Judge Stabile concurred in the majority's "discussion and summary of applicable legal principles in its analysis" but dissented with respect to the decision to remand to the trial court. *Id*. at 768. In his view, a remand was "unnecessary because the relief ordered by the trial court comports with the applicable standard governing content-neutral injunctions that have the effect of restricting speech." *Id*.; *see id*. at 772 ("while the trial court improperly looked to a time, manner and place analysis in coming to the injunctive relief it ordered, the relief nonetheless burdened no more speech than necessary to serve the significant government interest in protecting the privacy of [the Oberholzers'] home" and, therefore, any error was "harmless").

We granted allowance of appeal to consider the following questions posed by the Galapos:

(1) Whether an injunction prohibiting ongoing publication constitutes an impermissible prior restraint under Article I, Section 7 of the Pennsylvania Constitution?

(2) Whether the publication of language which gives rise to tort claims other than defamation cannot be enjoined under Article I, Section 7 of the Pennsylvania Constitution?

(3) Whether the Superior Court committed an error of law by concluding that the injunction was content-neutral and therefore not subject to strict scrutiny?

*Oberholzer v. Galapo*, 286 A.3d 1232, 1233 (Pa. 2022) (*per curiam*).[8]

## II. Arguments

Pointing to the plain text of Article I, Section 7 of the Pennsylvania Constitution and this Court's decisions interpreting it, the Galapos begin by underscoring that the provision "was designed 'to prohibit the imposition of prior restraints upon the communication of

---

[8] These claims all implicate "the right to free speech as guaranteed by the state and federal constitutions" and thus "our standard of review is *de novo* and our scope of review is plenary." *S.B.*, 243 A.3d at 104.

thoughts and opinions, leaving the utterer liable only for an abuse of the privilege.'" Galapos' Brief at 16, *quoting William Goldman Theatres*, 173 A.2d at 62. They then argue the Superior Court wrongly concluded the "injunction does not constitute a prior restraint because it addresses 'existing signs' and not 'future communications.'" *Id.* at 17. In the Galapos' view, since "the posting of the messages was ongoing, the signs are both existing communications, as well as future communications." *Id.*

The Galapos recognize no Pennsylvania court has addressed a scenario in which a defendant was "prohibited from **repeating** specific words already spoken or **removing** existing publications." *Id.* (emphasis in original). But, they submit, "federal courts with jurisdiction in Pennsylvania have considered such scenarios and, applying Pennsylvania law, have concluded that such injunctions run afoul of Article I, Section 7" and our decision in *Willing*. *Id.* at 17-19 (discussing *Tarugu v. Journal of Biological Chemistry*, 478 F. Supp. 3d 552, 555 (W.D. Pa. 2020) (request for "permanent injunction enjoining [d]efendants from further displaying or disseminating the allegedly libelous [r]etraction and requiring [d]efendants to withdraw the [r]etraction, fails as a matter of law because 'equity will not enjoin a defamation' under Pennsylvania law") (citation omitted); *Puello v. Crown Heights Shmira, Inc.*, 2014 WL 3115156, at *2 (M.D. Pa. July 7, 2014) (asserting Pennsylvania follows "the majority rule that equity will not enjoin a libel") (internal quotations and citations omitted); and *Graboff v. Am. Ass'n of Orthopaedic Surgeons*, 2013 WL 1875819, at *5 (E.D. Pa. May 3, 2013) (concluding plaintiff sought "impermissible injunctive relief for a false light claim" after evaluating Pennsylvania law)).

The Galapos also fault the Superior Court for distinguishing *Willing* from the instant matter "when the fact patterns are so strikingly similar." *Id.* at 19. They argue both cases involve defendants who created signs that the plaintiffs objected to and, in both cases, "the courts, having reviewed the contents of the signs, entered injunctions to prohibit the

defendants from further making the objectionable statements." *Id*. at 20. The Galapos fail to see how the injunction in *Willing* was a prior restraint, yet the similar injunction in this case is not.[9]

Turning to the second issue presented, the Galapos ask us to hold the publication of language which gives rise to tort claims other than defamation cannot be enjoined. *See id*. at 22. They explain that, since the time *Willing* was decided over forty years ago, no Pennsylvania court has considered whether its holding that defamation cannot be enjoined "extends to speech leading to tort claims besides defamation, *i.e.*, whether equity can enjoin speech where said speech placed someone in a false light, created a nuisance, invaded privacy, etc." *Id*. The Galapos rely once again on federal cases — particularly *Graboff*, *supra* — which have addressed such issues and ultimately predicted this Court "would adhere to the traditional, common-law principle that equity will not enjoin defamation, especially when a party has an adequate remedy at law in the form of money damages." *Id*. at 25. The Galapos conclude that, as these federal courts resolved, "it does not and should not matter whether a plaintiff bases his or her request for injunctive relief on allegations of defamation, false light, nuisance, or any other tort." *Id*. at 26. "Instead, it is the speech itself that is and must be protected." *Id*.

The Oberholzers retort that, while Article I, Section 7 prohibits prior restraints, "[n]ot all restrictions on speech constitute a prior restraint of that speech." Oberholzers' Brief at 15. For example, they observe this Court has previously remarked that an order that does "not prevent [the] publishing [of] any information" or prevent an individual "from

---

[9] The ACLU of Pennsylvania filed an *amicus curiae* brief in support of the Galapos. Noting our decision in *Willing* pre-dated our seminal decision in *Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991), *amicus* asks us to engage "an injunction-specific *Edmunds* analysis of Article I, §7." ACLU's Brief at 3. However, "[g]iven this Court's extensive consideration of Article I, Section 7 under the *Edmunds* factors in *Pap's* [*A.M.*]," we find "no reason to engage in a full-blown *Edmunds* analysis here." *DePaul v. Commonwealth*, 969 A.2d 536, 547 (Pa. 2009).

writing whatever they pleased" is not an unlawful prior restraint. *Id*., *quoting Phila. Newspapers, Inc.*, 387 A.2d at 433. On this score, the Oberholzers highlight the fact that the trial court "did not enjoin publication of any defamatory or libelous matter in restricting the placement of the content of the signs." *Id*. at 24.

As for *Willing*, the Oberholzers assert it "falls outside the analytical framework for prior restraint under the trial court's injunction." *Id*. at 25. The Oberholzers insist the ultimate unrelated holding in *Willing* simply hinged on the longstanding principle that equity will not enjoin a defamation, and "[p]rivate property interests and targeting speech invading private residential property were not at issue[.]" *Id*. In short, the Oberholzers see nothing "strikingly similar" between *Willing* and this case. *Id*. Likewise, they deem unpersuasive the federal cases relied upon by the Galapos, because those cases "did not involve the Constitutional rights of a homeowner in the peace and tranquility of his/her private property and home." *Id*. at 28.

Regarding the second issue presented, the Oberholzers call it an "unnecessary replay of the decisional law already discussed" under the first issue. *Id*. at 30. They argue that "*Willing* and the federal decisions [cited by the Galapos] did not involve tort claims other than libel and defamation and the lower court here did not adjudicate the injunction on defamation[.]" *Id*. at 30-31. They then fault the Galapos for supposedly citing "no authority" to support their view that "a claim of invasion or intrusion of private property, or any tort, with targeting speech would never pass constitutional scrutiny for restraint simply because speech was involved." *Id*. at 31 (emphasis omitted).

### III. Legal Background

Pennsylvania's Constitution, "drafted in the midst of the American Revolution," was "the first overt expression of independence from the British Crown." *Edmunds*, 586 A.2d at 896. Since its adoption on September 28, 1776, a decade and a half before the

adoption of the federal Bill of Rights, our state charter has provided strong protection in this Commonwealth for freedom of expression. Freedom of expression, which broadly includes rights of speech, press, assembly, and petition, was reflected in two provisions of the 1776 Declaration of Rights, as well as in our Frame of Government.[10]

"The Constitutional [C]onvention of 1790 rewrote Pennsylvania's free expression provisions into the lineal ancestors of their current form." Seth F. Kreimer, *Protection of Free Expression: Article I, Sections 7 and 20*, in THE PENNSYLVANIA CONSTITUTION: A TREATISE ON RIGHTS AND LIBERTIES, §10.1, 296 (Ken Gormley, *et al*. eds., 2d ed. 2020). All provisions were consolidated in the Declaration of Rights, which was promulgated as the final article (Article IX) of the 1790 Constitution. Two admonitions bookended Article IX: on the front end, the Article announced "[t]hat the general, great, and essential principles of liberty and free Government may be recognized and unalterably established, WE DECLARE"; and on the back end, it concluded "[t]hat everything in this article is excepted out of the general powers of government, and shall forever remain inviolate." PA. CONST. of 1790, art. IX.[11]

Freedom of press and speech were consolidated in a new section (Section VII) of the 1790 Constitution titled "Of the liberty of the press." It provided:

> [a.] That the printing presses shall be free to every person who undertakes to examine the proceedings of the legislature, or any branch of

---

[10] *See* PA. CONST. of 1776, Declaration of Rights, art. XII ("That the people have a right to freedom of speech, and of writing, and publishing their sentiments; therefore the freedom of the press ought not to be restrained."); *id*. at art. XVI ("That the people have a right to assemble together, to consult for their common good, to instruct their representatives, and to apply to the legislature for redress of grievances, by address, petition, or remonstrance."); PA. CONST. of 1776, Frame of Government, §35 ("The printing presses shall be free to every person who undertakes to examine the proceedings of the legislature, or any part of government.").

[11] This introductory and concluding language was retained by subsequent Constitutions.

government: And no law shall ever be made to restrain the right thereof.

[b.]  The free communication of thoughts and opinions is one of the invaluable rights of man; and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty.

[c.]  In prosecutions for the publication of papers, investigating the official conduct of officers, or men in a public capacity, or where the matter published is proper for public information, the truth thereof may be given in evidence: And, in all indictments for libels, the jury shall have a right to determine the law and the facts, under the direction of the court, as in other cases.

PA. CONST. of 1790, art. IX, §VII.[12]  The text of subsections (a)-(b) remained unchanged through the Constitutions of 1838, 1874, and 1968, though they are now found in Article I, Section 7, under the title "Freedom of press and speech; libels."[13]

---

[12] Regarding the legislative history of the free speech provision found in subsection (b), it has been observed that

> Section 7 of article 9, relating to liberty of the press, was originally reported to the convention by the committee to draft a proposed constitution, on December 21, 1789, in the following form: " . . . The free communication of thoughts and opinions is one of the most invaluable rights of men, and every citizen may freely speak, write, and print, being responsible for the abuse of that liberty."  Proceedings of Convention, P. 162, (Harrisburg, 1825.)  This was reported from committee of the whole on February 5, 1790, in the same form, (dropping only the word "most" before the word "invaluable")[.]

*Commonwealth v. McManus*, 22 A. 761, 762 (Pa. 1891) (Mitchell, J., concurring).

[13] Subsection (c) was retained in the Constitution of 1838 but amended in 1874 to read: "No conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury; and in all indictments for libels the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases."  PA. CONST. of 1874, art. I, §7.  This language was retained in the 1968 Constitution.  However, in *Commonwealth v. Armao,* 286 A.2d 626 (Pa. 1972), we held this portion of Article I, Section 7 was "repugnant to the guarantees of the First Amendment" in light of the United States Supreme Court's decision in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) (holding that in a civil action by a public official against a newspaper, First Amendment required clear and convincing proof that a defamatory falsehood alleged as libel was published with "actual (continued…)

Importantly, the first Section of the Declaration of Rights provides that all citizens "have certain inherent and indefeasible rights[.]" PA. CONST. art. I, §1. "Among those inherent rights are those delineated in §7[.]" *Pap's A.M.*, 812 A.2d at 603; *see W. Pa. Socialist Workers 1982 Campaign v. Conn. Gen. Life Ins. Co.*, 515 A.2d 1331, 1335 (Pa. 1986) ("The Pennsylvania Constitution did not create these rights. The Declaration of Rights assumes their existence as inherent in man's nature. It prohibits the government from interfering with them[.]"); *Commonwealth v. Tate*, 432 A.2d 1382, 1388 (Pa. 1981) ("the rights of freedom of speech, assembly, and petition have been guaranteed since the first Pennsylvania Constitution, not simply as restrictions on the powers of government, as found in the Federal Constitution, but as inherent and 'invaluable' rights of man").

Given this past, it is apparent that Pennsylvania's "Article I, Section 7 is an ancestor and not a stepchild of the First Amendment[.]" *S.B.*, 243 A.3d at 112. Moreover, as we have explained many, many times, the protections it guarantees "are distinct and firmly rooted in Pennsylvania history and experience." *Pap's A.M.*, 812 A.2d at 605; *see id*. at 596 ("Article I, §7 has its own rich, independent history, and [ ] this Court has repeatedly determined that it affords greater protection for speech and conduct than does the First Amendment."); *id*. at 603 ("Freedom of expression has a robust constitutional history and place in Pennsylvania."); *DePaul*, 969 A.2d at 546 ("history of Article I, Section 7 . . . is deep and the protections afforded freedom of expression by that provision longstanding"); *Tate*, 432 A.2d at 1390 (discussing "this Commonwealth's great heritage of freedom and

malice"). *Armao*, 286 A.2d at 632. Nevertheless, we found that sentence was "severable" from the remainder of Section 7. *Id*.

We also observe the right to assemble and petition was retained in Article IX, Section 20 of the 1790 Constitution, in wording that has remained unchanged to the present Constitution, but it now resides in Article I, Section 20. *See* PA. CONST. art. I, §20 ("The citizens have a right in a peaceable manner to assemble together for their common good, and to apply to those invested with the powers of government for redress of grievances or other proper purposes, by petition, address or remonstrance.").

the compelling language of the Pennsylvania Constitution").  We pause briefly to review some of that history.

Especially noteworthy is the fact Pennsylvania "was the home both of its founder, William Penn, and of Andrew Hamilton."  *Pap's A.M.*, 812 A.2d at 604.  Both greatly influenced our state charter.  Starting with Penn, he was famously "prosecuted in England for the 'crime' of preaching to an unlawful assembly and persecuted by the court for daring to proclaim his right to a trial by an uncoerced jury."  *Tate*, 432 A.2d at 1388.  We recounted the details of that shocking trial in *Commonwealth v. Contakos*, 453 A.2d 578 (Pa. 1982):

> In 1670 William Penn and William Mead were tried before a jury at the Old Bailey in London on an indictment of unlawful assembly, disturbing the peace, and "causing a great concourse and tumult."  Penn, *The Tryal of William Penn and William Mead for Causing a Tumult* (1719, 1919 Boston) 2.  Penn had addressed a group of three hundred Quakers in Grace Church Street, London, after the Quakers had found their meeting house locked by order of the crown.  At the trial which followed, the jury found that Penn spoke in the street, but refused to find him guilty of any criminal offense.  The judges directed the jury to find the defendants guilty as charged, but the jury refused, whereupon the court directed that they be confined without food or amenities until they complied.

> The jury, however, refused to comply, and the trial was abruptly ended after the jury had been confined to the jury chamber for two days.  The court's displeasure with the verdict was reflected in its fining of the jurors forty Marks each and imprisoning them until the fines were paid.  Although Penn was found not guilty, he too was imprisoned for fines based on contempt of court.  The jurors were released, however, after Chief Justice Sir John Vaughan of the Court of Common Pleas issued a writ of habeas corpus.  The Chief Justice held that judges may not compel a verdict in a criminal case against the convictions of the jury.  *See* "The Trial of William Penn," 6 *Litigation* (Winter 1980), 35, 49.

*Id*. at 580-81.  "This trial is likely to have left an impression on Penn[,]" especially in fashioning his Frame of Government, which "was a contract between the proprietor, Penn, and the citizens of his colony, expressing his political philosophy and proposed laws for the governance of the colony."  *Id*. at 581-82.

As for Andrew Hamilton, his "defense of John Peter Zenger played no less direct a role in both the federal and Pennsylvania protection of the freedom of the press and, hence, expression." *Pap's A.M.*, 812 A.2d at 605. Justice Bell discussed Zenger's trial in *In re Mack*, 126 A.2d 679 (Pa. 1956):

> Freedom of the press — the right to freely publish and fearlessly criticize — was a plant of slow growth. It did not spring full-grown as Minerva did from the brow of Jupiter, nor rise as quickly as did the warriors when Cadmus sowed the dragon's teeth. It was planted by many hardy, freedom-loving souls and nurtured by public opinion for several centuries before it grew to be a tree of gigantic stature. Government both in England and the United States constantly tried to suppress or destroy it. Freedom of the press became a recognized inherent Right only after and as a result of the famous Zenger libel case in New York City in 1735. In that case Zenger's lawyer, Andrew Hamilton of Philadelphia, argued vigorously for the right of a newspaper to criticize freely and truthfully the acts and conduct of governmental officials. The Court refused to recognize the theory of freedom of the press, or permit Hamilton to prove "Truth" as a defense; nevertheless the jury, ignoring the charge of the Court, acquitted Zenger. Public opinion rallied to the cause which Hamilton pleaded and freedom of the press gradually became recognized as an inalienable Right which was ordained and affirmed in the Constitution of the United States and in the Constitution of Pennsylvania[.]

*Id*. at 683-84 (Bell, J., concurring and dissenting); *see* Kreimer, §10.2(a), at 298 & n.15 (quoting Hamilton's remark that freedom of expression is a "bulwark against lawless power . . . a right which all freemen claim"; "nature and the laws of our country have given us a right — the liberty — both of exposing and opposing arbitrary power . . . by speaking and writing truth") (citation omitted).

A final historical anecdote is worth mentioning, as it pertains to the prior restraints issue before us. In *William Goldman Theatres*, we acknowledged that "members of the Constitutional Convention of 1790 were undoubtedly fully cognizant of the vicissitudes and outright suppressions to which printing had theretofore been subjected in this very Colony." 173 A.2d at 61. We supported this proposition by recounting how

> [i]n 1689 William Bradford, a young printer, who had introduced the art of printing to the middle provinces of America, had printed the Charter of the

Province so that the people could see their rights. Apparently anticipating trouble, he had not put his name on the pamphlet. He was summoned none the less before the Governor of the Colony where the following colloquy took place: Governor: "Why, sir, I would know by what power of authority you thus print? Here is the Charter printed!" Bradford: "It was by Governor Penn's encouragement I came to this Province and by his license I print." Governor: "What, sir, had you license to print the Charter? I desire to know from you, whether you did print the Charter or not, and who set you to work?"

*Id*. at 61 n.1 (citation omitted). "In 1692 Bradford was arrested for seditious libel; although the jury could not agree on his conviction Bradford was held over until next term and his tools and letters were released only when Penn was deprived of the colony in 1693." Kreimer, §10.2(b), at 302 & n.28 (internal quotations and citation omitted).

Against this deep historical backdrop, this Court has forged a "comprehensive" and "independent constitutional path" under Article I, Section 7. *Pap's A.M.*, 812 A.2d at 606; *see id*. at 607 (in various contexts, "this Court has not hesitated to render its independent judgment as a matter of distinct and enforceable Pennsylvania constitutional law"). In fact, "[o]ur interpretations of the scope of the fundamental rights addressed in Article I, §7 have continued from passage of the Civil War Amendments to the federal Constitution and up to the present day." *Id*.; *see* Kreimer, §10.5(b)(7), 339-40 (detailing this Court's precedents interpreting Article I, Section 7 and explaining that, although our free speech jurisprudence "in the mid-twentieth century in large measure tracked federal doctrine[,]" "[a]s the McCarthy era receded," we "began to approach free expression cases with a somewhat greater degree of independence").

Perhaps unsurprisingly given this Commonwealth's long and storied history, in many cases we held Article I, Section 7 provides broader protections of expression than the First Amendment guarantee. *See id*. at 611-12 (nude dancing is protected expression under Article I, Section 7, even though it is afforded less protection by First Amendment); *Commonwealth, Bureau of Prof'l & Occupational Affairs v. State Bd. of Physical Therapy*,

728 A.2d 340, 343-44 (Pa. 1999) (commercial speech in form of advertising by chiropractors entitled to greater protection so long as not misleading); *Ins. Adjustment Bureau v. Ins. Comm'r*, 542 A.2d 1317, 1324 (Pa. 1988) (Article I, Section 7 does not allow restriction of commercial speech by government agency where legitimate, important interests of government may be accomplished in less intrusive manner); *Tate*, 432 A.2d at 1391 (political leafletting on college campus deemed protected expression under Article I, Section 7 where First Amendment may not protect same); *William Goldman Theatres*, 173 A.2d at 64 (statute providing for censorship of movies, while not necessarily violative of First Amendment, violates Article I, Section 7).

Of course, even the enhanced protections of Article I, Section 7 do not extend to **every** conceivable type or instance of expression. We have so held in a number of cases. *See, e.g.*, *Working Families Party v. Commonwealth*, 209 A.3d 279, 285-86 (Pa. 2019) (in context of assessing constitutionality of "anti-fusion" (also known as "cross-nominations") provision in Pennsylvania's Election Code, finding no reason to depart from First Amendment law); *Commonwealth v. Davidson*, 938 A.2d 198, 215 (Pa. 2007) ("no Pennsylvania case has purported to afford broader protection to child pornography under Article I, Section 7"); *Norton v. Glenn*, 860 A.2d 48, 58 (Pa. 2004) ("with regard to the neutral reportage doctrine, the Pennsylvania Constitution's protection of free expression is no broader than its counterpart in the federal Constitution"); *Phila. Fraternal Order of Correctional Officers v. Rendell*, 736 A.2d 573, 577 (Pa. 1999) ("freedom of speech does not include the right to force another to listen, and we can glean no similar compulsion based upon the Constitution of Pennsylvania"); *W. Pa. Socialist Workers 1982 Campaign*, 515 A.2d at 1333 (Article I, Section 7 "does not guarantee access to private property" — in that case, a privately-owned shopping mall at which individuals sought to collect signatures for a gubernatorial candidate's nominating petition — "for the exercise of such

rights where . . . the owner uniformly and effectively prohibits all political activities"); *Ullom v. Boehm*, 142 A.2d 19, 21 (Pa. 1958) (statute prohibiting advertising of ophthalmic products was a valid exercise of police power that did not violate Article I, Section 7); *Mack*, 126 A.2d at 681 (Pa. 1956) (upholding judicial rule prohibiting the taking of pictures in courthouse; "freedom of the press . . . is subject to reasonable rules seeking maintenance of the court's dignity and the orderly administration of justice"); *Fitzgerald v. City of Phila.*, 102 A.2d 887, 891 (Pa. 1954) (loyalty oath not unconstitutional under Article I, Section 7; rights asserted "do not extend to freedom to meet with others, knowingly and deliberately, for the discussion of plans to overthrow the government by force or violence"); *Commonwealth v. Widovich*, 145 A. 295, 298 (Pa. 1929) ("The Legislature, under the police power, . . . may prohibit the teaching or advocacy of a revolution or force as a means of redressing supposed injuries, or effecting a change in government."); *City of Duquesne v. Fincke*, 112 A. 130, 132 (Pa. 1920) (upholding conviction for violating city ordinance that forbade the holding of public meetings on city streets without a permit; "the streets are . . . intended for passage and not for assemblage"); *Duffy v. Cooke*, 86 A. 1076, 1081-82 (Pa. 1913) (statute prohibiting employees of cities of the first class from participating in political activities did not violate Article I, Section 7).

Having examined those parts of our state charter that combine to form the broad, overarching right to freedom of expression, we now turn more specifically to the right to free speech.

## A. Freedom of Speech

The Pennsylvania Constitution of 1776 was "the first Constitution [in the country] to protect 'freedom of speech and of writing.'" Kreimer, §10.1, at 293 n.3 (citation

omitted).[14]  The Constitutional Convention of 1790 rewrote the provision to state: "The free communication of thoughts and opinions is one of the invaluable rights of man; and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty."  PA. CONST. of 1790, art. IX, §VII.  And, as we have already said, Pennsylvania "retained this declaration unchanged through three constitutional revisions over the last two hundred [and thirty-five] years."  Kreimer, §10.4, at 304; *accord* PA. CONST. art. I, §7.

Without question, the "freedom of thought and speech . . . is the matrix, the indispensable condition, of nearly every other form of freedom."  *Duggan v. 807 Liberty Ave., Inc.*, 288 A.2d 750, 754 (Pa. 1972) (internal quotations and citation omitted); *see Tate*, 432 A.2d at 1388 ("protection given speech . . . was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people") (internal quotations and citation omitted).  This Court scrutinized the language guaranteeing these paramount rights under Article I, Section 7 in *Pap's A.M.*:

> As a purely textual matter, Article I, §7 is broader than the First Amendment in that it guarantees not only freedom of speech . . . , but specifically affirms the "invaluable right" to the free communication of thoughts and opinions, and the right of "every citizen" to "speak freely" on "any subject" so long as that liberty is not abused.  "Communication" obviously is broader than "speech."  Nevertheless, we do not overstate this distinction, since the U.S. Supreme Court has long construed the First Amendment as encompassing more than what constitutes purely speech[.]

812 A.2d at 603.  Along similar lines, we recognized long ago that the right guaranteed by this provision, "to 'freely speak, write, or print,' is as broad as language can make it,

---

[14] "Vermont's Constitution of 1777 adopted language identical to that of Pennsylvania. But these protections of 'speech' stood alone until the adoption of the First Amendment in 1791."  Kreimer, §10.1, at 293 n.3 (citation omitted).

with the single limitation that [the speaker] shall be responsible for the abuse of that privilege." *Briggs v. Garrett*, 2 A. 513, 518 (Pa. 1886).[15]

Speech can come in many forms — for example, pictures, drawings, paintings, films, engravings, oral utterances, the printed word, and messages conveyed over the internet can all constitute speech. No matter the form, speech is generally protected by Article I, Section 7. *See, e.g.*, *William Goldman Theatres*, 173 A.2d at 61 ("motion pictures for public exhibition are entitled to the constitutional guarantee of free speech"). Importantly, though, "[f]reedom of speech is not absolute or unlimited[.]" *Wortex Mills v. Textile Workers Union of Am.*, 85 A.2d 851, 854 (Pa. 1952); *see Bogash v. Elkins*, 176 A.2d 677, 678 (Pa. 1962) ("Freedom of speech is one of the most prized rights of every American but it is not absolute."). We have held, for example, that "a man may not slander or libel another; . . . he may not engage in loud speaking through sound trucks during certain hours or in certain parts of a city; and he may not assemble with others to commit a breach of the peace or to incite to riot or to advocate the commission of crimes." *Wortex Mills*, 85 A.2d at 854. As well, although "[p]icketing is a form of assembly and of speech and consequently comes" within Article I, Section 7, "that does not mean that . . . every kind of speech and every kind of picketing is lawful." *Id.*; *see Westinghouse Elec., Corp. v. United Elec., Radio & Mach. Workers of Am. (CIO) Local 601*, 46 A.2d 16, 21 (Pa.

---

[15] It is worth noting "the right to speak carries with it its inevitable counterpart, the right not to speak." *Dudek v. Pittsburgh City Fire Fighters, Local No. 1*, 228 A.2d 752, 755 (Pa. 1967); *see id.* ("It is just as illegal to compel one to speak when he prefers to remain silent as it is to gag one when he wishes to talk."). We also observe, parenthetically, that over one hundred years ago we intimated, without much elaboration, that the right to speech "cannot lawfully be infringed . . . by individuals, any more than by the state[.]" *Spayd v. Ringing Rock Lodge No. 665, Brotherhood of R.R. Trainmen of Pottstown*, 113 A. 70, 72 (Pa. 1921); *see W. Pa. Socialist Workers 1982 Campaign*, 515 A.2d at 1335 ("We are not suggesting that the rights enumerated in the Declaration of Rights exist only against the state.").

1946) (picketing "is a right constitutionally guaranteed as one of free speech[,]" but only "when free from coercion, intimidation and violence") (footnote omitted).

## B. Prior Restraints

The second half of the free speech provision of Article I, Section 7 provides that any citizen who engages in speech is "responsible for the abuse of that liberty." PA. CONST. art. I, §7. Not long after the 1790 Constitution was adopted, this Court interpreted this provision as creating a straightforward rule: "Publish as you please in the first instance without control; but you are answerable both to the community and the individual, if you proceed to unwarrantable lengths." *Respublica v. Dennie*, 4 Yeates 267, 269 (Pa. 1805); *see Commonwealth v. Duane* (Pa. 1806) (Tilghman, C.J.), *reported at* 1 Binn. 97, 1804 WL 969, at *1 n.a ("It is generally understood . . . that this provision was intended to prevent men's writings from being subject to the previous examination and control of an officer appointed by the government, as is the practice in many parts of Europe, and was once the practice in England"); *see also Respublica v. Oswald*, 1 U.S. 319, 325 (Pa. 1788) (M'Kean, C.J.) (equating the "restraint" prohibited by the 1776 Pennsylvania Constitution with those licensing schemes that were overturned in the British struggle for freedom of the press during the seventeenth century; "The true liberty of the press is amply secured by permitting every man to publish his opinions; but it is due to the peace and dignity of society to enquire into the motives of such publications, and to distinguish between those which are meant for use and reformation, and with an eye solely to the public good, and those which are intended merely to delude and defame."); Kreimer, §10.5(a), at 310 (noting the "responsibility for abuse" language "contemplated by Article I, Section 7 clearly encompasses criminal as well as civil liability").

More than a century and a half later, we decided *William Goldman Theatres*. There, we held "it is clear enough that what [the provision] was designed to do was to

prohibit the imposition of prior restraints upon the communication of thoughts and opinions, leaving the utterer liable only for an abuse of the privilege." 173 A.2d at 62. We explained that "[h]istory supports this view." *Id*.

> After the demise in 1694 of the last of the infamous English Licensing Acts, freedom of the press, at least freedom from administrative censorship, began in England, and later in the Colonies, to assume the status of a "common law or natural right." Blackstone so recognized (circa 1767) when he wrote, "The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no previous restraints upon publications, and not in freedom from censure for criminal matter when published. Every freeman had an undoubted right to lay what sentiments he pleases before the public; to forbid this is to destroy the freedom of the press; but if he publishes what is improper, mischievous, or illegal, he must take the consequence of his own temerity. To subject the press to the restrictive power of a licenser, as was formerly done, both before and since the revolution, is to subject all freedom of sentiment to the prejudices of one man, and make him the arbitrary and infallible judge of all controverted points in learning, religion, and government. But to punish (as the law does at present) any dangerous or offensive writings, which, when published, shall on a fair and impartial trial be adjudged of a pernicious tendency, is necessary for the preservation of peace and good order, of government and religion, the only solid foundations of civil liberty. Thus the will of individuals is still left free; the abuse only of that free will is the object [of] legal punishment. Neither is any restraint hereby laid upon freedom of thought or inquiry; liberty of private sentiment is still left; the disseminating or making public of band [sic] sentiments, destructive of the ends of society, is the crime which society corrects."
>
> What Blackstone thus recognized as the law of England concerning freedom of the press came to be, 133 years later, an established constitutional right in Pennsylvania as to both speech and press; Article IX, Section 7, of the Constitution of 1790 so ordained; and, as already pointed out, the provision still endures as Article I, Section 7, of our present Constitution.

*Id*. (internal citations omitted).[16]

---

[16] The majority's reliance on Blackstone in *William Goldman Theatres* implicitly rejected Justice Eagen's view in dissent that "the delegates to the Constitutional Convention [of 1790] were more influenced by the results of the United States Constitutional Convention, which also was aware of the long history of oppression, than by Blackstone[.]" 173 A.2d at 72 (Eagen, J., dissenting).

Recognizing Article I, Section 7's hostility towards prior restraints, we struck down the law at issue in *William Goldman Theatres* as facially unconstitutional. We explained it was "designed to effect . . . a pre-censorship of the exercise of the individual's right freely to communicate thoughts and opinions" by "plac[ing] in the hands of three persons, selected by the Governor, the power, throughout the State, to judge and condemn motion picture films, reels, and views as obscene." *Id*. at 64. In that way, the law "empower[ed] the censors to trespass too far upon the area of constitutionally protected freedom of expression." *Id*. at 66; *see Tate*, 432 A.2d at 1388 (freedom of speech must be "protected against censorship" since "the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups") (internal quotations and citation omitted).

Next came *Willing*. In that case, which we have already touched upon above, the *en banc* Superior Court majority discussed "the traditional view that equity does not have the power to enjoin the publication of defamatory matter." *Mazzocone v. Willing*, 369 A.2d 829, 831 (Pa. Super. 1976), *rev'd*, 393 A.2d 1155 (Pa. 1978). It explained four reasons why equity traditionally declined to enjoin defamation: "(1) equity will afford protection only to property rights; (2) an injunction would deprive the defendant of his right to a jury trial on the issue of the truth of the publication; (3) the plaintiff has an adequate remedy at law; and (4) an injunction would be unconstitutional as a prior restraint on freedom of expression." *Id*. Yet, the Superior Court majority determined "blind application" of the rule under the facts of that case, where Willing was insolvent and presumably could not pay monetary damages for defamatory speech, "would be antithetical to equity's historic function of maintaining flexibility and accomplishing total justice whenever possible." *Id*. Thus, the majority largely upheld the injunction prohibiting Willing from wearing her sandwich-board sign that was critical of her former attorneys.

Judge Jacobs, joined by Judges Hoffman and Spaeth, dissented. He argued the traditional rule that equity will not enjoin defamation "has been specifically followed in Pennsylvania[.]" *Id*. at 836 (Jacobs, J., dissenting), *citing Balt. Life Ins. Co. v. Gleisner*, 51 A. 1024 (Pa. 1902). As such, he believed "any attempted censorship by the court through the writ of injunction is no less objectionable than is the exercise of that function by other departments of the government; such censorship is in effect prohibited by constitutional guaranties of freedom of speech and of the press, and by the constitutional right of trial by jury." *Id*.

Of course, as we earlier noted, we reversed on appeal. We began by declaring the "case raises serious and far reaching questions regarding the exercise of the constitutional right to freely express oneself." *Willing*, 393 A.2d at 1157. Then, we quickly resolved that "the orders issued by the Superior Court and by the trial court" were "**clearly prohibited by Article I, Section 7** . . . and by [*William*] *Goldman Theatres*[.]" *Id*. (emphasis added). Reaching this conclusion exclusively under our state charter "obviate[d] the need for any discussion [ ] of federal law" and "render[ed] unnecessary any discussion of the Superior Court's proposed exception to the so-called traditional view that equity lacks the power to enjoin the publication of defamatory matter." *Id*. at 1158. In other words, *Willing* recognized for the first time that, regardless of the common law maxim that equity will not enjoin a defamation, Article I, Section 7 independently bars the enjoinment of defamatory speech in this Commonwealth. *See* ACLU's Brief at 11 ("There can be no doubt that the members of Pennsylvania's Constitutional Conventions of 1790 and 1838 were aware of the maxim that equity will not enjoin a libel and sought to incorporate it into our fundamental charter."). Nevertheless, in addressing the Superior Court's common law theory, the *Willing* Court also remarked that, in this Commonwealth, "the insolvency of a defendant does not create a situation where there is no adequate

remedy at law." *Id*.; *see id*. ("In deciding whether a remedy is adequate, it is the remedy itself, and not its possible lack of success that is the determining factor.").  Since *Willing*, this Court "has not upheld an injunction prohibiting an exercise of free expression in the face of a prior restraint challenge under Article I, Section 7."  Kreimer, §10.5(a)(1), at 315.[17]

So far as prior restraints are concerned, we make three additional points.  First, the Pennsylvania Constitution "has codified the proscription of prior restraints on speech, whereas the federal Constitution prohibits prior restraints in most situations based upon the common law." *Uniontown Newspapers, Inc. v. Roberts*, 839 A.2d 185, 193 (Pa. 2003).  Second, it should not be forgotten that prior restraints, though often associated with restrictions upon the press, do not arise only in that context.  *See, e.g.*, *William Goldman Theatres*, 173 A.2d at 64 (Motion Picture Control Act constituted a prior restraint).  Thus, while it is true that in *Phila. Newspapers, Inc.*, this Court stated a "prior restraint prevents publication of information or material in the possession of the press[,]" 387 A.2d at 432, that passage is best understood as articulating one type of prior restraint, not all types.  Third, "permanent injunctions — *i.e.*, court orders that actually forbid speech activities — are classic examples of prior restraints."  *Alexander v. United States*, 509 U.S. 544, 550 (1993); *see* Kreimer, §10.5(a)(1), at 311 ("injunctions share with licensing schemes an orientation towards preventing rather than punishing allegedly illegal communications" since they "turn on the determination of a single official" and "can be granted with the

---

[17] Although *Willing* is a plurality decision, its central conclusions hold precedential value. This is because Justice Roberts, joined by Justice O'Brien, held in concurrence that "[t]he injunction in this case is a classic example of a prior restraint on speech."  393 A.2d at 1159 (Roberts, J., concurring).  Likewise, Justice Pomeroy's concurrence explained that his "views leading to this result are fully and clearly set forth in" Judge Jacob's dissent in the Superior Court, which held the same.  *Id*. at 1160 (Pomeroy, J., concurring).  Thus, a four-Justice majority in *Willing* held the enjoinment of defamatory speech is "clearly prohibited by Article I, Section 7[.]"  *Id*. at 1157.  *Cf*. Dissenting Opinion (Wecht, J.) at 12 (labeling *Willing* a "nonbinding plurality opinion").

stroke of a pen"); *id*. ("Injunctions interfere with the dissemination of information on the basis of potentially exaggerated threats of possible future harm, rather than on the basis of the results of abuse proven before a jury."); Erwin Chemerinsky, *Injunctions in Defamation Cases*, 57 SYRACUSE L. REV. 157, 165 (2007) ("Injunctions are treated as prior restraints because that is exactly what they are: a prohibition on future expression.").

## IV. Analysis

Mindful of this extensive legal and historical context, we now address the case before us. Initially, we must decide whether the conduct at issue qualifies as speech, expressive conduct, or a mix of the two. This is because, even where prior restraints potentially are in play, the nature of the communication can alter the analysis. *See, e.g.*, *Ins. Adjustment Bureau*, 542 A.2d at 1324 (in context of commercial speech, "Article I, Section 7, will not allow [a] prior restraint . . . where the legitimate, important interests of government may be accomplished practicably in another, less intrusive manner"). What's more, the parties strongly dispute the true nature of the Galapos' actions in posting the signs, and the courts below reached varying conclusions on this issue. Notably, the judge who entertained the request for a preliminary injunction concluded the signposting "was, on some levels, pure speech[.]" Trial Court Op., 4/28/17, at 8. Meanwhile, a different judge who later heard the request for permanent injunctive relief held the Galapos' actions "cannot be considered pure speech" because it was effectively "a personal protest[.]" Trial Court Op., 9/12/19, at 9-10. That judge also found the present circumstances to be "analogous to [ ] targeted picketing[.]" *Id*. at 10. Similarly, the Superior Court determined the Galapos engaged in "targeted speech," a category which it described as "including picketing and protesting." *Oberholzer*, 274 A.3d at 766.

Upon careful review, we conclude the Galapos' signposting constituted an act of pure speech; it does not fit the bill of "picketing." *See Kirmse v. Adler*, 166 A. 566, 570

(Pa. 1933) ("The court below construed certain acts to be an unlawful picketing and enjoined them, . . . but the facts on this record will not sustain his decree."). Although "picketing is a mode of communication it is inseparably something more and different." *Wortex Mills*, 85 A.2d at 855 (internal quotations and citation omitted); *see Locust Club v. Hotel & Club Emp. Union*, 155 A.2d 27, 34 (Pa. 1959) ("picketing . . . involves more than mere speech"). Notably, picketing is a form of speech **and assembly**, as it typically "involves patrol of a particular locality[,]" an act which "may induce action of one kind or another" by those being picketed. *Wortex Mills*, 85 A.2d at 855 (internal quotations and citation omitted).

The trial court here found no facts which would support its determination that the Galapos engaged in picketing. Significantly, the Galapos never physically accompanied their signs; they simply placed them in their yard for the world to see and left it at that. "Completely absent" here "are those non-speech elements of picketing which have, in prior cases, been the basis and justification for state interference." *1621, Inc. v. Wilson*, 166 A.2d 271, 275 (Pa. 1960). There was no "patrolling" or human presence of any kind, which has always been the linchpin of picketing. In short, the Galapos' signposting was an act of pure speech that constituted "nothing more than an attempt at persua[s]ion," which is protected by Article I, Section 7. *Id*.; *see Kirmse*, 166 A. at 569 ("Do the methods used involve intimidation or coercion in any form? If they do not, but are peaceful and orderly, equity will not interfere."); *cf. Barker v. Commonwealth*, 19 Pa. 412, 412 (Pa. 1852) (rejecting free speech claim and affirming judgment in a nuisance prosecution against a defendant who "by means of violent, loud, and indecent language" "caus[ed] to assemble and remain [in the public highway] for a long space of time, great numbers of

men and boys, so that the streets were obstructed and the public were interrupted in the enjoyment of their rights of passing and repassing") (internal quotations omitted).[18]

The fact that one purpose of the Galapos' signs was to engage in a "personal protest" against the Oberholzers does not alter this conclusion. Trial Court Op., 9/12/19, at 9. Surely, a protest was part of the motive behind the signs. *See, e.g.*, N.T. Preliminary Injunction Hearing, 10/18/16, at 41 (Dr. Galapo testifying what he wants "to accomplish by the signs is to protest behavior which we perceive as being racist towards myself, my wife, and my family"). But so what? Again, Article I, Section 7 "specifically affirms the 'invaluable right' to the free communication of thoughts and opinions, and the right of 'every citizen' **to 'speak freely' on 'any subject'** so long as that liberty is not abused." *Pap's A.M.*, 812 A.2d at 603 (emphasis added). Those sweeping terms necessarily include the right to use speech as a means of (peaceful) protest. *See, e.g.*, *1621, Inc.*, 166 A.2d at 275 ("appeal not to patronize [a] liquor establishment" that neighborhood groups considered an undesirable nuisance was "nothing more than an attempt at persua[s]ion" and thus was protected activity since freedom of speech includes "the right to publicly communicate one's ideas to others and to air grievances"); *Warren v. Motion Picture Mach. Operators New Castle*, 118 A.2d 168, 171 (Pa. 1955) ("In a democracy, so long as the communication . . . in any [ ] type of quarrel . . . advocates persuasion and not coercion, thus appealing to reason and not to force, there attends the messagebearer the invisible sentinel of the law protecting the right of freedom of communication."); *Watch*

---

[18] In dissent, Justice Brobson "conclude[s] that the speech at issue is targeted speech that is intended to **harass** the Oberholzers and **coerce** them to alter their behavior, which makes the speech at issue similar in nature to [ ] picketing[.]" Dissenting Opinion (Brobson, J.) at 11 (emphasis added). But the words "harass" and "coerce," which obviously carry legal significance in this context, were never used by the permanent injunction judge, the factfinder in this matter. What he said instead was that the Galapos' "conduct arguably **does not** fit the definition of picketing[.]" Trial Court Op., 9/12/19, at 9 (emphasis added). On that point we agree. We disagree, however, with the "harassing" and "coercion" gloss added by the dissent.

*Tower Bible & Tract Soc'y v. Dougherty*, 11 A.2d 147, 148 (Pa. 1940) (*per curiam*) (affirming dismissal of cause of action filed against Roman Catholic Church and one of its priests where the priest threatened to boycott a department store whose radio station broadcast anti-Catholic programming; defendants "cannot be mulcted in damages for protesting against the utterances of one who they believe attacks their church and misrepresents its teachings").

In any event, the Galapos' ultimate aim was far broader than just protesting. *See* N.T. Preliminary Injunction Hearing, 10/18/16, at 54 (Dr. Galapo stating he "want[s] people to understand what happens with racism"); *id.* at 44 (detailing how racism "affects the neighbors as well" and thus the messages portrayed on the signs "can be taken both on a community level, on an individual level, as well as on a worldwide level"). Article I, Section 7, like the First Amendment, protects speech that serves multiple ends. *See Snyder*, 562 U.S. at 454 ("even if a few of the signs — such as 'You're Going to Hell' and 'God Hates You' — were viewed as containing messages related to [a particular person], that would not change the fact that the overall thrust and dominant theme of [the] demonstration spoke to broader public issues"); *see also Cohen v. California*, 403 U.S. 15, 26 (1971) ("much linguistic expression serves a dual communicative function: it conveys not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well").[19]

What matters is whether the "speech is of public or private concern, as determined by all the circumstances of the case." *Id.* at 451. "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or

---

[19] We adhere to the view that "First Amendment authority remains instructive in construing Article I, Section 7[.]" *DePaul*, 969 A.2d at 547. Accordingly, to the extent we rely upon federal caselaw, we do so purely as a means of independently adopting such principles for purposes of Article I, Section 7.

other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Id*. at 453 (internal quotations and citations omitted). Further, the "arguably inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Id*. (internal quotations and citation omitted).

Here, it cannot seriously be disputed that the messages relayed by the Galapos' signs are matters of public concern. Mrs. Oberholzer admitted to making an offensive, anti-Semitic remark to Dr. Galapo, which some might argue is "part of a broader, societal trend of hate and violence toward Jewish people." *Tannous v. Cabrini Univ.*, 697 F. Supp. 3d. 350, 367 (E.D. Pa. 2023). In response, the Galapos erected on their own lawn stationary signs decrying hatred, anti-Semitism, and racism. We have no hesitation in finding "[t]hese are concerns of general interest to the Jewish community and the wider public[.]" *Id.*, *citing Fenico v. City of Phila.*, 70 F.4th 151, 165 (3d Cir. 2023) ("[S]peech touching on race relations is inherently of public concern.") (internal quotations and citation omitted), *Locurto v. Giuliani*, 447 F.3d 159, 183 (2d Cir. 2006) ("[C]ommentary on race is, beyond peradventure, within the core protections of the First Amendment."), and *Rybas v. Wapner*, 457 A.2d 108, 110 (Pa. Super. 1983) ("Individuals should be able to express their views about the prejudices of others without the chilling effect of a possible lawsuit in defamation resulting from their words."); *see Clark v. Allen*, 204 A.2d 42, 46 (Pa. 1964) ("no question or issue has divided the American people" more than "the highly emotional question of racism"); *id*. at 47 ("It is absolutely essential for the existence and preservation of our Country that opinions on such vitally important and highly controversial issues should be vigorously argued and debated[.]").

Having resolved that the Galapos engaged in speech, we shift our focus to whether the trial court possessed the power to enjoin it. We conclude it did not. Article I, Section 7, as interpreted in *William Goldman Theatres* and *Willing*, dictates this result.

The Superior Court took the position that a prior restraint is implicated only by "an order forbidding **future** communications[,]" whereas the injunction entered by the trial court here addressed "existing signs, *i.e.*, preexisting, and not **future**, communications[.]" *Oberholzer*, 274 A.3d at 750 (emphasis in original). But we rejected similar arguments in *William Goldman Theatres* and *Willing*. Beginning with *William Goldman Theatres*, we found the statutory provisions at issue in that case effected an improper prior restraint on speech not only because they "restrain[ed] the initial showing of a film for 48 hours after notice to the Board of its intended exhibition[,]" but also because "**subsequent** showings [were] likewise subjected to previous restraint[.]" 173 A.2d at 64 (emphasis added). Similarly, the injunction in *Willing* was aimed at "permanently enjoin[ing Willing] from **further** demonstrating against and/or picketing" her former attorneys. 393 A.2d at 1157 (emphasis added). In both cases, then, the speech was ongoing, yet we nevertheless deemed the injunctions to be improper prior restraints. Perhaps most telling of all, in *William Goldman Theatres*, Justice Eagen specifically argued in dissent that "[t]here is a marked difference between 'prior restraints' and 'post restraints,'" but the Court was unpersuaded under the facts of that case. 173 A.2d at 69.[20]

---

[20] Justice Wecht charges us with "obscur[ing] the important differences between the prior restraint doctrine" and what he calls the "no-injunction rule" (also known as the common law rule that equity will not enjoin a defamation). Dissenting Opinion (Wecht, J.) at 2. But, in reality, it is Justice Wecht who gravely misunderstands the two doctrines and their application in this Commonwealth. Most critically, contrary to Justice Wecht's apparent belief, we do not "adopt the disfavored theory that equity will not enjoin defamation." *Id*. at 15. Defamation is not at issue here. Neither is the common law. The relevant question we agreed to consider is "[w]hether the publication of language which gives rise to tort claims **other than defamation** cannot be enjoined **under Article I, Section 7**[.]" *Oberholzer*, 286 A.3d at 1233 (emphasis added). This unearths the root of the problem (continued…)

We are left with two issues: (1) whether the publication of language which gives rise to tort claims other than defamation cannot be enjoined under Article I, Section 7, and (2) whether the Oberholzers have identified any countervailing constitutional rights that might alter our approach.

The first issue is easily resolved, because the text of Article I, Section 7 does not distinguish between defamation or any other tort involving speech. *See, e.g.*, *League of Women Voters v. Commonwealth*, 178 A.3d 737, 802 (Pa. 2018) ("The touchstone of

with Justice Wecht's view: he conflates the common law principle with the constitutional command found in Article I, Section 7. Indeed, among the bevy of law review articles he combs for support, Justice Wecht overlooks the important fact that Professor David S. Ardia, "whose scholarship has greatly informed [Justice Wecht's] understanding of this case," Dissenting Opinion (Wecht, J.) at 6 n.17, expressly cautions that "several courts have held that the free speech guarantees in their state constitutions **pose an independent bar to injunctive relief** in defamation cases." David S. Ardia, *Freedom of Speech, Defamation, and Injunctions*, 55 Wm. & Mary L. Rev. 1, 50 (2013) (emphasis added). In addition to citing our decision in *Willing* for that proposition, Professor Ardia identifies six other state supreme courts — California, Louisiana, Missouri, Montana, Nebraska, and Texas — which have similarly held their state constitution counterparts to our Article I, Section 7 independently operate to bar injunctions in defamation cases. *See id.* at 50 n.230, *citing Dailey v. Super. Ct.*, 44 P. 458, 460 (Cal. 1896), *State ex rel. Liversey v. Judge of Civil Dist. Court*, 34 La. Ann. 741, 746 (La. 1882), *Life Ass'n of Am. v. Boogher*, 3 Mo. App. 173, 179-80 (Mo. 1876), *Lindsay & Co. v. Mont. Fed'n of Labor*, 96 P. 127, 131 (Mont. 1908), *Howell v. Bee Pub. Co.*, 158 N.W. 358, 359 (Neb. 1916), and *Mitchell v. Grand Lodge, Free & Accepted Masons of Tex.*, 121 S.W. 178, 179 (Tex. Civ. App. 1909). Clearly, then, it is incorrect to say the bar on speech-based injunctions "does not emanate from Article I, Section 7" and that we are the only "state in the entire nation" that has constitutionalized such a bar. Dissenting Opinion (Wecht, J.) at 15-16. Professor Ardia's own work proves the opposite on both points.

To reiterate, we agree with Professor Ardia that this Court in *Willing* held that, regardless of the common law, injunctions of defamatory speech are "clearly prohibited by Article I, Section 7[.]" 393 A.2d at 1157. Simply calling *Willing* a "nonbinding plurality opinion" does not make it so. Dissenting Opinion (Wecht, J.) at 12; *see also id.* at 19-20 and n.70 (calling our decision in *William Goldman Theatres* "plainly wrong" and adopting Justice Eagen's dissent). And no number of law review articles or federal cases concerning the common law can trump our binding precedent on this matter of state constitutional law. As for the question left unanswered by *Willing*, *i.e.*, whether the constitutional bar we recognized in that case with respect to defamatory speech also extends to other speech-based torts, we turn to it next.

interpretation of a constitutional provision is the actual language of the Constitution itself."). In fact, the provision does not even mention defamation. But this makes sense, because the provision is not concerned with tort law; its purpose is to jealously protect "the free communication of thoughts and opinions," speech included. PA. CONST. art. I, §7; *see Phila. Newspapers, Inc.*, 387 A.2d at 433 n.16 ("direct restraints upon expression impose restrictions on human thought and strike at the core of liberty"). That protection does not turn on the label attached to a cause of action. If it did, litigants could avoid the prior restraints provision by simply dressing up a defamation claim as something else. We do not believe Article I, Section 7's abhorrence of prior restraints can be so easily avoided. Instead, we hold that what matters for purposes of a prior restraints analysis under Article I, Section 7 is whether it is **speech** that is sought to be enjoined. If so, the court generally lacks the power to grant injunctive relief, regardless of the nature of the underlying cause of action. *See Kraemer Hosiery Co. v. American Fed'n of Full Fashioned Hosiery Workers*, 157 A. 588, 603 (Pa. 1931) (Maxey, J., dissenting) ("[I]deas are not subject to injunction. Ideas have far-reaching effects. Some of these effects may be good and some may be evil, but it is opposed to progress and contrary to the spirit of our institutions to entrust any official with the arbitrary power to say what ideas shall be liberated and what ideas shall be suppressed.").[21]

---

[21] Justice Brobson concludes a "private nuisance is distinct from other torts" this Court has previously held cannot be enjoined under the free speech principles of Article I, Section 7. Dissenting Opinion (Brobson, J.) at 15. He cites in support the Restatement (Second) of Torts and three cases that generally stand for the proposition that trial courts possess the power to enjoin nuisances. *See id.* at 11-12, *citing* REST. 2D TORTS §822, *Gardner v. Allegheny Cnty.*, 114 A.2d 491 (Pa. 1955), *Rhodes v. Dunbar*, 57 Pa. 274 (Pa. 1868), and *Youst v. Keck's Food Services, Inc.*, 94 A.3d 1057 (Pa. Super. 2014). But none of those cases involved speech or Article I, Section 7. More to the point, our learned colleague forgets the venerable principle that "the polestar of constitutional analysis . . . must be the plain language of the constitutional provision[ ] at issue." *In re Bruno*, 101 A.3d 635, 659 (Pa. 2014). The plain language of Article I, Section 7 offers no exception (continued…)

The final issue we must tackle is the Oberholzers' argument that an injunction was warranted given that this case uniquely involves "[p]rivate property interests and targeting speech invading private residential property[.]" Oberholzers' Brief at 25; *see id*. at 31 n.3 (arguing "common law nuisance constitutes the legal grounds for injunctive relief").

Preliminarily, we stress that "[p]roperty has no rights, no privacy. Persons do." *Commonwealth ex rel. Cabey v. Rundle*, 248 A.2d 197, 199 (Pa. 1968). That said, we have also recognized that "[u]pon closing the door of one's home to the outside world, a person may legitimately expect the highest degree of privacy known to our society." *Commonwealth v. Flewellen*, 380 A.2d 1217, 1220 (Pa. 1977); *see Bedminster Twp. v. Vargo Dragway, Inc.*, 253 A.2d 659, 661 (Pa. 1969) ("Although not entitled to absolute quiet in the enjoyment of property, every person has the right to require a degree of quietude which is consistent with the standard of comfort prevailing in the locality wherein he lives."); *see also Carey v. Brown*, 447 U.S. 455, 471 (1980) ("The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society.").

"One important aspect of residential privacy is protection of the unwilling listener." *Frisby*, 487 U.S. at 484. Ordinarily, "we expect individuals simply to avoid speech they do not want to hear[.]" *Id*.; *see Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210-11 (1975) ("the burden normally falls upon the viewer to avoid further bombardment of [his] sensibilities simply by averting [his] eyes") (internal quotation and citation omitted). But this does not require individuals to "welcome unwanted speech **into** their own homes[.]" *Frisby*, 487 U.S. at 485 (emphasis added); *see F.C.C.*, 438 U.S. 726 (offensive radio broadcasts); *Rowan v. U.S. Post Office Dept.*, 397 U.S. 728 (1970) (offensive mailings);

---

for pure-speech-based nuisances, and surely we cannot rewrite the Constitution to create one.

*Kovacs v. Cooper*, 336 U.S. 77, 86-87 (1949) (sound trucks). Simply put, there "is no right to force speech into the home of an unwilling listener." *Frisby*, 487 U.S. at 485.

At the same time, however, the "mere fact that speech takes place in a residential neighborhood does not automatically implicate a residential privacy interest." *Id*. at 492 (Brennan, J., dissenting). "It is the intrusion of speech into the home or the unduly coercive nature of a particular manner of speech around the home that is subject to more exacting regulation." *Id*. at 492-93. "[S]o long as the speech remains outside the home and does not unduly coerce the occupant, the government's heightened interest in protecting residential privacy is not implicated." *Id*. at 493.

Taking all these principles into account, we hold that although trial courts generally lack the power to enjoin speech under Article I, Section 7, because freedom of speech is not absolute and residents "may legitimately expect the highest degree of privacy known to our society" when inside their homes, *Flewellen*, 380 A.2d at 1220, and enjoy the "right to require a degree of quietude which is consistent with the standard of comfort prevailing in the locality wherein [they] live[,]" *Bedminster Twp.*, 253 A.2d at 661, courts may enjoin pure speech occurring in the residential context "upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner." *Cohen*, 403 U.S. at 21.[22]

---

[22] Each of the dissents asks us to take a different path. First, Justice Wecht, citing no Pennsylvania authority other than his own dissent in a First Amendment case, asserts our analysis of Article I, Section 7 should proceed "as it does in other cases involving restrictions on speech, by considering the 'fit' between the injunction's legitimate objectives and the restraints it imposes on speech" and then by "apply[ing] either strict or intermediate scrutiny, depending upon whether the restriction is content-based or content-neutral." Dissenting Opinion (Wecht, J.) at 22. But this position ignores that "Article I, §7 has its own rich, independent history" and that it "affords greater protection for speech and conduct than does the First Amendment." *Pap's A.M.*, 812 A.2d at 596. We are unwilling to disregard or overrule that long line of historical cases, including *William Goldman Theatres* and *Willing*.

(continued…)

Here, though, we are unconvinced that the Galapos' signs intolerably intrude upon any substantial privacy interests held by the Oberholzers. The Galapos' signs are stationed exclusively on their own property and they lack any coercive or other element that might implicate the Oberholzers' privacy interests. *See* N.T. Deposition of Denise Oberholzer, 3/13/18, at 42-43 (admitting none of the signs mentioned the Oberholzers by name, encroached their property, or were threatening); N.T. Deposition of Frederick Oberholzer, 3/13/18, at 29-30 (same). Nor do the signs present any type of actionable, non-speech-based nuisance, like excessive illumination or loud noises. *See Kohr v. Weber*, 166 A.2d 871, 872 (Pa. 1960) ("loud noises, glaring illumination, and swirling dust

---

For his part, Justice Brobson "conclude[s] that the trial courts of this Commonwealth have the authority to enjoin residential speech protected by Article I, Section 7 . . . that rises to the level of a private nuisance and disrupts the quiet enjoyment of a neighbor's home." Dissenting Opinion (Brobson, J.) at 1. In support of this position he relies on *Klebanoff*, a Superior Court decision that (1) has never been cited by this Court, (2) clearly treated Article I, Section 7 as coterminous with the First Amendment, and (3) offered no discussion of prior restraints under our state charter. He also cites *Frisby*, a First Amendment case, and *Rouse*, another unapproved Superior Court case decided exclusively under the First Amendment. None of these sources offer any insight into Article I, Section 7 or this Commonwealth's unique history when it comes to speech. In that vein, we strongly disagree that *Willing* is "of little-to-no precedential value to the present matter" simply because it did not involve the right to quiet enjoyment of the home. *Id*. at 15. *Willing*'s analysis of Article I, Section 7 is directly on point and binding.

To the extent this case, unlike *Willing*, requires "a balancing of rights[,]" *id*., we observe that the dissents have not actually identified a competing **constitutional** right. Instead, they generally invoke the High Court's oft-repeated line from *Carey* (which involved a state statute, not a court injunction flowing from a private dispute between neighbors) that a "State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." 447 U.S. at 471. *See* Dissenting Opinion (Wecht, J.) at 23; Dissenting Opinion (Brobson, J.) at 21. While we do not question the legitimacy of this State interest, the competing constitutional interests presently before us are the Galapos' free speech rights under Article I, Section 7, and the Oberholzers' (and to some extent the Galapos') rights under Article I, Section 1. *See* PA. CONST. art. I, §1 ("All men . . . have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, [and] of acquiring, possessing and protecting property[.]"). With respect to those constitutional rights, our careful examination leads us to conclude the standard above reflects the appropriate balance in cases involving pure residential speech.

clouds which" accompanied facility for drag-racing properly enjoined). The signs are just that: signs. All homeowners at one point or another are forced to gaze upon signs they may not like on their neighbors' property — be it ones that champion a political candidate, advocate for a cause, or simply express support or disagreement with some issue. If a single judge could suppress such speech any time an offended viewer invoked a generalized right to residential privacy, without proving more — specifically, that substantial privacy interests are being invaded in an essentially intolerable manner — it would mark the end to residential expression; after all, we cannot ignore that the Galapos have property rights too.[23]

On this latter point, *City of Ladue v. Gilleo*, 512 U.S. 43 (1994), is particularly compelling. The High Court in that case discussed how a "special respect for individual liberty in the home has long been part of our culture and our law," a principle with "special resonance when the government seeks to constrain a person's ability to **speak** there."

---

[23] An example proves the point. Imagine an individual flies a Pride flag with the phrase "Love is Love" in his yard to commemorate Pride Month. Imagine also that the individual's next-door neighbor observes a religion that is strongly opposed to Pride Month and the view that "love is love." In the eyes of the neighbor, the Pride flag may come off as deeply offensive, perhaps even targeted. Under Justice Brobson's test, that subjective belief alone would provide a sufficient basis for a judge to order the flag removed. And that decision, according to Justice Brobson, would be unassailable on appeal. *See* Dissenting Opinion (Brobson, J.) at 18 (suggesting "we must accept the trial court's factual findings" that the Galapos' signs disrupt the quiet enjoyment of the Oberholzers' home) (internal quotations, emphasis, and citation omitted). Respectfully, we think the citizens of this Commonwealth would be quite surprised to learn that, notwithstanding the robust protection that Article I, Section 7 affords, they can be hauled into court on the whim of any offended neighbor and judicially forced to suppress their pure residential speech simply because that speech subjectively disrupts the neighbor's quiet enjoyment of his home. As we see it, the problems with Justice Brobson's approach are manifest: it sets the bar too low; it offers no meaningful or administrable legal standard; and it essentially encourages Pennsylvanians to rush to court with their private disputes involving speech, which are often grounded in hotly contested social issues, while simultaneously inviting judges to make content-based social judgment calls. None of these qualities is a virtue. More importantly, they cannot be squared with Article I, Section 7.

*Id*. at 58 (internal citations omitted) (emphasis in original); *see id*. (government's "need to regulate temperate speech from the home is surely much less pressing"). The Court also addressed signs specifically, which it described as "a venerable means of communication that is both unique and important." *Id*. at 54. It stated:

> Signs that react to a local happening or express a view on a controversial issue both reflect and animate change in the life of a community. Often placed on lawns or in windows, residential signs play an important part in political campaigns, during which they are displayed to signal the resident's support for particular candidates, parties, or causes. They may not afford the same opportunities for conveying complex ideas as do other media, but residential signs have long been an important and distinct medium of expression.
>
> . . . .
>
> Displaying a sign from one's own residence often carries a message quite distinct from placing the same sign someplace else, or conveying the same text or picture by other means. Precisely because of their location, such signs provide information about the identity of the "speaker." As an early and eminent student of rhetoric observed, the identity of the speaker is an important component of many attempts to persuade. A sign advocating "Peace in the Gulf" in the front lawn of a retired general or decorated war veteran may provoke a different reaction than the same sign in a 10-year-old child's bedroom window or the same message on a bumper sticker of a passing automobile. An espousal of socialism may carry different implications when displayed on the grounds of a stately mansion than when pasted on a factory wall or an ambulatory sandwich board.
>
> Residential signs are an unusually cheap and convenient form of communication. Especially for persons of modest means or limited mobility, a yard or window sign may have no practical substitute. Even for the affluent, the added costs in money or time of taking out a newspaper advertisement, handing out leaflets on the street, or standing in front of one's house with a handheld sign may make the difference between participating and not participating in some public debate. Furthermore, a person who puts up a sign at her residence often intends to reach **neighbors**, an audience that could not be reached nearly as well by other means.

*Id*. at 54-57 (footnotes and internal citations omitted) (emphasis in original).

These principles speak directly to the matter at hand. The Galapos made clear they were intending to reach the Oberholzers, plus the rest of the local community, with

their message. Broadly speaking, that message was aimed at raising awareness of the consequences of hatred and racism. As the Galapos posted the signs on their own lawn, moreover, they provided information about themselves as the speakers. In the same way a "sign advocating 'Peace in the Gulf' in the front lawn of a retired general or decorated war veteran may provoke a different reaction than the same sign in a 10–year–old child's bedroom window," *id*. at 56, so too may a sign advocating anti-hatred views when placed in the yard of a Jewish family and directed towards a family that made anti-Semitic remarks. Indeed, as members of the Jewish community, the Galapos "had a unique, and valuable, perspective" on the matter. *Appeal of Chalk*, 272 A.2d 457, 461 (Pa. 1971).

At the end of the day, what the Galapos seek to do is persuade on an issue of public importance; that is precisely the kind of speech Article I, Section 7 not only protects, but encourages. *See, e.g.*, *Tate*, 432 A.2d at 1388 ("A function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea.") (internal quotations and citation omitted). And, as we acknowledged at the start, speech is powerful. So we do not doubt the permanent injunction judge's finding that the Galapos' signs "severely and negatively impact the [Oberholzers'] well-being, tranquility, and quiet enjoyment of their home." Trial Court Op., 9/12/19, at 7. That finding, however, is not equivalent to a determination "that substantial privacy interests are being invaded in an essentially intolerable manner[,]" *Cohen*, 403 U.S. at 21, and the record does not support such a conclusion in any event.[24] Accordingly, because the Galapos seek to engage in protected

---

[24] Plainly, Justice Brobson is mistaken in asserting we "displace[ ] the trial court's factual findings[.]" Dissenting Opinion (Brobson, J.) at 19; *see id*. at 18 (the majority "substitutes its contrary assessment of the harm to the Oberholzers with that of the trial court"). In (continued…)

speech that does not invade substantial privacy interests in an essentially intolerable manner, the burden falls upon the Oberholzers to "avoid further bombardment of their sensibilities simply by averting their eyes." *Id*.; *see also Kirmse*, 166 A. at 568 ("This [C]ourt . . . has never impressed the strong arm of an equitable injunction unless the circumstances imperatively required it.").[25]

In reaching this result, we do not take lightly the concerns raised by the dissents and the Oberholzers about the right to quiet enjoyment of one's property, and we recognize some may be uneasy with the notion trial courts generally are powerless to

_____

fact, we take the court's findings at face value. Even so, they do not satisfy the applicable constitutional standard. As for Justice Brobson's objection to our decision to make this pure legal assessment ourselves rather than remand to the trial court, *see id*. at 17, we note that, in free speech cases, "an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Int. of J.J.M.*, 265 A.3d 246, 270 (Pa. 2021) (internal quotations and citations omitted). That is precisely what we have done.

[25] It does not matter that the trial court only ordered the Galapos to turn their signs around and make them opaque rather than take them down entirely. By preventing the Galapos from directing their message to one of their intended audiences — the Oberholzers — the court violated the Galapos' speech rights. *See City of Ladue*, 512 U.S. at 57 ("a person who puts up a sign at her residence often intends to reach **neighbors**, an audience that could not be reached nearly as well by other means") (emphasis in original); *Erznoznik*, 422 U.S. at 210 ("the Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer"); *Consol. Edison Co. of NY v. Pub. Serv. Comm'n of NY*, 447 U.S. 530, 541-42 (1980) ("Where a single speaker communicates to many listeners, the First Amendment does not permit the government to prohibit speech as intrusive unless the 'captive' audience cannot avoid objectional speech."); *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 586, 603 (2023) ("all persons are free to think and speak as they wish, not as the government demands[,]" "regardless of whether the government considers [the] speech sensible and well intentioned or deeply misguided, and likely to cause anguish or incalculable grief") (internal quotations and citations omitted). To put it simply, "[n]o matter how laudably inspired or highly conceived" the court's injunction order was, "its restrictions impinge upon the freedoms of the" Galapos to exercise free speech protected by Article I, Section 7, so "it cannot stand." *William Goldman Theatres*, 173 A.2d at 62; *see Spayd*, 113 A. at 72-73 (freedom of speech "cannot lawfully be infringed, even momentarily"; "a temporary giving up or denial of an inalienable right . . . is as void as though permanent in character").

enjoin such speech.[26]   But this is not to say **the government** is powerless to act in this area.   On the contrary, speech signs placed in one's yard "are subject to municipalities' police powers."   *City of Ladue*, 512 U.S. at 48; *see id*. ("It is common ground that governments may regulate the physical characteristics of signs — just as they can, within reasonable bounds and absent censorial purpose, regulate audible expression in its capacity as noise."); *Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85, 93-94 (1977) (ordinances that "promote aesthetic values[,]" such as those regulating "lawn signs of a particular size or shape[,]" are permissible when they are "unrelated to the suppression

---

[26] We say "generally" (in fact, we've said this word a few times now, which should highlight the caveat's importance) because different circumstances might yield different results in other cases – for example, if the dispute concerns more than just pure residential speech, or if a litigant demonstrates a true deprivation of residential privacy consistent with the standard outlined above, or successfully invokes the right to reputation under Article I, Section 1.  *See, e.g.*, *Phila. Newspapers, Inc.*, 387 A.2d at 433 ("government may, when necessary, protect personal liberties even where enforcement of those liberties may subordinate in limited instances the constitutional interests of others"); *Norton*, 860 A.2d at 58 (describing the "seesawing balance between the constitutional rights of freedom of expression and of safeguarding one's reputation"; "protection of one of those rights quite often leads to diminution of the other").  *Cf.* Dissenting Opinion (Wecht, J.) at 14-15 (contending our rule somehow "blocks equity courts from preventing further reputational damage" even though the Oberholzers never invoked the right to reputation).  And, of course, trial courts remain empowered to enjoin those expressions which cross the line from protected to unprotected speech, because they fall outside of Article I, Section 7's protective ambit.  *See, e.g.*, *Davidson*, 938 A.2d at 215 ("freedom of speech has its limits; it does not embrace . . . defamation, incitement, obscenity, and pornography produced with real children") (internal quotations and citation omitted); *Kirmse*, 166 A. at 570 ("the right of communication, or persuasion, [is protected] provided [one's] appeals [are] not abusive, libelous, or threatening"); *Warren*, 118 A.2d at 171 ("equity will step in to halt the club, the brickbat or flying stone which substitutes intimidation for argument and terror for common sense").  Finally, because this case does not involve defamation or a jury verdict, it cannot fairly be construed as rejecting the view that "permanent injunctions can be issued after a jury has determined that the specific statements sought to be enjoined are in fact defamatory[.]"  Dissenting Opinion (Wecht, J.) at 5.  As Justice Wecht points out, our precedent arguably supports that position.  *See id*., *citing Balt. Life Ins. Co.*, 51 A. at 1024 (injunction sought in relation to claims of slander or libel properly denied where, *inter alia*, the claims were not "first [ ] established by the verdict of a jury").  We simply have no occasion to consider that separate issue in this case.

of free expression") (internal quotations and citation omitted); *Andress v. Zoning Bd. of Adjustment of City of Phila.*, 188 A.2d 709, 712 (Pa. 1963) ("These rights and freedoms are subject to the paramount right of the Government to reasonably regulate and restrict, under a reasonable and non-discriminatory exercise of the police power, the use of property, whenever necessary for the public health, safety, morals and general welfare."). So, for example, a generally applicable, content-neutral ordinance that reasonably limits the total number of signs residents are permitted to have in their yards would likely not raise constitutional concern. *See, e.g.*, *City of Ladue*, 512 U.S. at 58-59 (although a "ban on almost all residential signs violates the First Amendment[,]" "more temperate measures could in large part satisfy [municipalities'] regulatory needs without harm to the First Amendment rights of its citizens"); Kreimer, §10.5(b)(6), at 328 ("the 'free communication of thoughts and opinions' is not infringed by generally applicable regulations simply because they impose some collateral burden on communication"). Nothing we say today impacts the ability of the government to utilize such powers for the public good.

## V. Conclusion

We hold the Galapos engaged in protected speech when they posted in their own yard stationary signs decrying hatred and racism. We further hold the Oberholzers failed to prove that substantial privacy interests are being invaded in an essentially intolerable manner by the Galapos' pure residential speech. As such, Article I, Section 7 of the Pennsylvania Constitution and this Court's precedents precluded the trial court from enjoining the signs, regardless of the nature of the torts alleged. The injunction imposed an improper prior restraint on speech in violation of Article I, Section 7. We therefore affirm the Superior Court's order only insofar as it vacated the injunction entered by the

trial court; we reverse the Superior Court's decision remanding for further proceedings, and instead order the injunction dissolved.[27]

Chief Justice Todd and Justices Donohue and Mundy join the opinion.

Justice Wecht files a dissenting opinion.

Justice Brobson files a dissenting opinion.

---

[27] Because "[w]e rest decision in this case upon our own Constitution, law and public policy[,]" *Locust Club*, 155 A.2d at 34, we do not reach or address the First Amendment issues presented.